## BROWN v. SUTTON.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF WISCONSIN.

No. 97. Argued and submitted November 26, 1888.—Decided January 28, 1889.

On the whole proof in this case, some of which is referred to in the opinion of the court: *Held*,

(1) That the appellant's intestate intended that the property in dispute should belong to the appellee, that he bought it for her, and that he promised her orally that he would make over the title to her

upon the consideration that she should take care of him during the remainder of his life, as she had done in the past;

(2) That there had been sufficient part performance of this parol contract to take it out of the operation of the Statute of Frauds, in a court of equity, and to render it capable of being enforced by a decree for specific performance.

(3) That the appellee had been guilty of no laches by her delay in commencing this suit.

BILL IN EQUITY, to compel a specific performance of a parol contract to convey a tract of real estate in Wisconsin. Decree in complainant's favor, from which respondent appealed. The case is stated in the opinion.

*Mr. Erastus F. Brown* (with whom was *Mr. Edgar K. Brown* on the brief) for appellants.

*Mr. Edwin Hurlbut* and *Mr. Winfield Smith*, for appellee, submitted on their brief.

MR. JUSTICE MILLER delivered the opinion of the court.

The bill was brought by Sarah S. Sutton, the appellee, against Erastus F. Brown and Francis A. Kenyon, executors of the last will of John S. Kenyon, and was in the nature of a suit for specific performance of a contract and for the conveyance of the title to a certain house and grounds in the city of Oconomowoc, in Wisconsin. There was no written agreement on the subject, but the suit is based upon the idea of a verbal promise or agreement upon the part of John S. Kenyon in his lifetime that he would convey the property to Mrs. Sutton, the appellee, and that such part performance had been had in its execution as to bring the case within the exception made by that doctrine in the requirement of the Statute of Frauds that the sale of lands must be in writing.

The executors and trustees under the will filed their answer, denying the existence of any verbal promise at all, and also denying that it was so far performed as to justify a decree. The court, however, rendered a decree in favor of Mrs. Sutton, that she was entitled to the property, and that the defendants

in the action should convey to her. It is from this decree that the present appeal is taken.

A history of the relations of the testator, John S. Kenyon, to Mrs. Sutton and her husband, is essential to a correct decision of the case. The following facts regarding them are in the main undisputed by either party.

In 1868 Mr. Kenyon lived with his wife in Harlem, in the city of New York; was a man of some wealth, an officer of a bank in Harlem, and at his death left an estate of nearly $200,000. He was without children or close kin in whom he was much interested, as was shown by his will, in which, after having made some slight provisions for some of his sisters, he devised the great bulk of his fortune to fifteen charitable and religious societies or associations. The father of Mrs. Sutton lived in New York and Brooklyn, and she had been intimate with Mr. Kenyon since her birth, being at the time of the trial about forty-four years old. Prior to 1868 she married Charles T. Sutton, and ever since lived with him as his wife, but had no children. The wife of Mr. Kenyon was for a very considerable period, certainly from 1868 to 1872, when she died, an invalid, requiring much care and attention. Mrs. Sutton spent a large part of her time, both before and after the date first mentioned, with her, assisting in the care of her during sickness. In 1868 Mr. Kenyon and his wife visited Oconomowoc, at the house of George F. Westover, whose wife was a sister of Mrs. Sutton. Thereafter the Kenyons removed to Tremont, near New York City, where Mrs. Kenyon died in February, 1872. During a large part of this time, and at her death, Mrs. Sutton was with her. Shortly after her decease, Mr. Kenyon and Mr. and Mrs. Sutton went to Oconomowoc together, lived in the family of Westover, paying therefor a consideration, and so continued until April, 1874, except a few weeks, when Mr. Kenyon was absent. Westover then removed to Chicago, and on the 28th of that month Kenyon bought a cottage in the village of Oconomowoc, and lived in it with the Suttons, who kept the house. On July 1, 1874, Kenyon made a deed of this cottage to Mrs. Sutton, declaring it to be in accordance with the request of his wife during her lifetime, as a tribute

from her to Mrs. Sutton. For seven years these three continued living together in that cottage, Kenyon making certain contributions for board, or as his quota towards the expenses of housekeeping. During these years he made frequent trips to New York on business connected with the bank of which he was a shareholder and probably a director, being absent from several weeks to three months at a time. While in New York in 1879 upon one of these visits, he made a will, in which, after disposing of several small items of personal property, giving to Mrs. Sutton all the personal property in her house at Oconomowoc, except his jewels, and the interest during her life on one-third of $10,000, and to his sisters some slight bequests of jewelry and furniture, the body of his estate was bequeathed to his executors as trustees for the associations referred to. In November, 1879, the Suttons closed the cottage and spent the winter in New York, in a house belonging to Mr. Kenyon and furnished by him, the family consisting of the same three persons and one servant. Thereafter they seem to have vibrated for a year or two between the house in New York and the cottage in Oconomowoc, always living together as one family. In September, 1880, Mr. Kenyon bought, for the consideration of $2300, the premises in dispute in this action, known as the "Oaks," situated in Oconomowoc, and in 1881 began the erection thereon of a large dwelling-house. Late in the fall of 1881 he went with the Suttons again to New York, and they all resided together as usual in his house, until he was stricken with apoplexy, and died in January following.

The bill alleges that the property called the Oaks was bought by Mr. Kenyon for Mrs. Sutton; that he had promised to buy it for her as a consideration for the services rendered to him, and to be thereafter performed, in keeping house for him and giving him her care and society, and that he also agreed to build thereon a new house, of sufficient dimensions to accommodate others besides these three who lived together as a family, so that if the necessity should arise, in event of Mr. Kenyon's death, she might be enabled to make a living by keeping boarders. It is claimed that the land was bought and

the house built in accordance with this promise, or at least that it was in progress of erection at the time of his death. A definite promise on his part to do this is asserted, the consideration for which was sufficient in what she had already done and had agreed thereafter to do for him. Mr. and Mrs. Sutton were placed in possession of the premises as soon as the purchase was made, and they were living there at the time the present suit was brought.

The controversy in the present case is really whether any such promise or agreement was made, because if it was there can be little doubt that the delivery of possession to the Suttons, and the construction of this house under their direction and control, is a sufficient part performance to take the case out of the Statute of Frauds.

As Mrs. Sutton was not competent as a witness to establish a promise on the part of Mr. Kenyon to convey the property to her, under § 858 of the Revised Statutes, and as Mr. Sutton, being her husband, was also incompetent, it can be readily seen, in the absence of any written agreement upon the subject or any correspondence between the parties, which could not reasonably be expected to exist as they were nearly always living together, that it is almost impossible to prove a direct verbal promise from Mr. Kenyon to her in regard to that matter. Any such promise must be largely inferred from the situation and circumstances of the parties, and must depend almost wholly on verbal statements made by Mr. Kenyon to others.

The depositions in the case contain full and ample evidence of the declarations of Mr. Kenyon on this subject. They are in substance, that he had bought the property for Mrs. Sutton; that he had given it to her, had placed her in possession of the ground, and was building a house upon it for her at the time of his death; and that he treated her and her husband as, and frequently called them, his "children," or "the children."

There can be no question that Mr. Kenyon bought the property in dispute with the intention, clear and well defined in his own mind, that he was buying it for Mrs. Sutton; and when he came to build the house upon it there can be as little

doubt that he erected it for her with the intention that it should be her house, expecting to live with the Suttons as long as he lived, and that it would go to her in the event of his dying before she did. It may be said, and it is true, that this unexecuted purpose of his is not of itself sufficient to constitute a contract to convey to her the house, nor would it alone be a sufficient foundation for a decree; but it leaves the case in such a position that no very strong evidence is required that such a contract did exist, as it would be entirely consistent with all the other uncontradicted testimony in regard to what he had said and done and with the possession of the property by her. There is also quite a sufficient consideration for such a promise in the services, care and attention rendered by her to an old man in his declining years, in connection with the fact that at the time he bought this property he was very sure of receiving these attentions as long as he lived. The evidence shows that this expectation on his part was fully realized. Let us examine briefly the positive evidence of a promise on this subject.

We have the testimony of Mr. Westover, whose relation to Mr. Kenyon and the family has already been noted, in whose house they lived for two summers prior to his removal to Chicago, and who seems to have been on intimate terms with Mr. Kenyon, that he had many conversations with him about his private matters, although he was not a man who talked generally about his affairs. He states that Mr. Kenyon was not well, and never was well, since he first went to Oconomowoc; that he was a pretty old man, at least old enough to be Mrs. Sutton's father, and probably older than her own father was; that he needed a great deal of nursing, and wanted more care and attention when near her in the little details of life than any man he ever saw; that he seemed to dread to be alone, and in fact she went everywhere with him, and devoted the most of her life during those years to him as a daughter to a father. He says: " She filled the place that an exceedingly attentive daughter would to a weak, sickly, old father. I never saw a case in a family of more marked service in that line than was that case. No person but Mrs.

Sutton was relied upon to look after his personal wants at all."

The witness then went on to state a conversation that he had with Mr. Kenyon about his affairs, in which he said of his relatives: "All they want of me is my money; some day they will be terribly disappointed;" and proceeded to say that no one had filled the place of a relative to him as had Mrs. Sutton; that he was under great obligations to her, and how to discharge it, to repay her, or attempt to repay her, was something that he was considering, and that he was going to recompense her for her services to him in some way. After the purchase of the property in dispute here, Westover asked Mr. Kenyon about it, and gives his language as follows: " He told me then that that was the final result of his determination as to Mrs. Sutton; that he had bought the place for her; that she wanted it, and he had made up his mind that it was the very best that could be done, *and he had promised her that he would put a house on the place, such as she wanted, and the place should be hers.* He said that it was not perhaps as much as Mrs. Sutton was really entitled to, but he thought that after all it would be better for her than if she should be provided for in some other way that would be even larger. He said that he had made her home his home, as I knew ; and it was understood that he was to continue thereafter making his home with Sortie, that is, Mrs. Sutton."

Mr. Kenyon then went on to say, as the witness states, that, by having a fine building on the place she would be able, if anything should happen to him, to take care of herself by keeping boarders; and continued:

"The house will be such as Mrs. Sutton wants. I have agreed that Sortie shall have the house just exactly as she wants it; just to suit her. He said he was to continue to make his home with Mr. and Mrs. Sutton, and that in view of the past and her services to him, and what had been done, and in view of the position which she was occupying as to him, and the services she had performed and was still to perform, *he had promised her that place,* and he had bought it for her because it pleased her, and he had promised to build such a house thereon as she should want."

If this statement be true, here is at once, the promise and the consideration for it, amounting to an agreement stated in Mr. Kenyon's own language, with all the clearness of detail necessary to a contract. There was no question about the property to be conveyed, the promise to build the house, the parties to the agreement, or the consideration for the promise.

The witness then details a conversation which he had in 1881, in which Mr. Kenyon reminded him of what he had said to him before on the same subject, and said that after much thought he had concluded that was the best arrangement, and she had agreed to it; that it was arranged between them that he should continue to live with her in the future; that he was under obligations to her for what she had done for him individually, and that he had made arrangements with her and she would continue to do for him as she had done, *and he had promised to buy that place for her and fix it up and deed it to her.* The witness then testified as to the board paid by Mr. Kenyon, and said: "I understood from him, as he said, that the services of Mrs. Sutton which she had rendered him, and which he was under obligations to requite, together with those of the same kind which she had agreed to perform in the future, were the basis *of his promise to convey her the premises in dispute,* and were outside of anything which he had furnished in cash expense of living."

Julia L. White, who was well acquainted with Mr. Kenyon, details various conversations with him, in one of which he said that he wanted to give the property which is now in controversy to Mrs. Sutton, for she had taken care of him and had promised and was to continue to take care of him as long as he lived, and that *he then said he had promised to give* it to her. She testifies that Mr. Kenyon stated to her that he desired to purchase this property for Mrs. Sutton on account of the services and care she had already given to him, *and had promised to give him;* and that he said on Wednesday before his death that he had bought the place, that it was for Mrs. Sutton, to make her home there for the care she had given him and for the care she promised to take of him until his death.

Mr. Small, who lives adjoining the property in dispute, details a long conversation he had with Mr. Kenyon in regard to the building of the house, and states that he said: "I am not building it for myself; I am building it for Mrs. Sutton." Mr. Kenyon then went on to say that he did not want to be bothered with the building of it; he had left it all to Mr. and Mrs. Sutton; he had nothing to do with the building except to furnish the money; that the rooms had all been arranged by her, and that he intended she should have it as she wanted it. He states that he asked Mr. Kenyon, in whom the title was, whether it was in Mrs. Sutton at that time, and he replied: "No, when the the property was bought I took the deed, but I intend to have the property all fixed in Mrs. Sutton." "I said, 'Haven't you done anything about it yet?' He said, 'No.' Said I, 'You may have it in your mind to do something you want to do, but if you do not do it, if you should be taken away, it won't be done. Under our law, unless there is a writing made, or the parties put in possession under the agreement, it won't amount to anything.' He said, 'I can't make anything out here for the reason my papers are in New York. I desire to make some alterations in my affairs. Then I shall fix it up, but I shall put them in possession. I have put them in possession. Mrs. Sutton has had possession ever since I went to New York in the summer. I turned it over to them then, and they are now in possession. Mrs. Sutton has the keys to the little house and all the property, and I intend they shall be in possession, and are in possession just as perfect as I can make it. If I had my papers here I should have them altered now. I have my attorney down there. I don't want to do anything until I get down there.' He said, 'I propose to give it to them. Mrs. Sutton has been very kind to me in sickness and disease in my family; took care of my wife until she died. I have a good home myself with them. I propose now to repay them in this way.'" The witness also testifies as to other conversations, in which Mr. Kenyon declared that the keys and the possession were in the Suttons; that the property was theirs to all intent and purposes; that the title was taken in his name when he bought the prop-

erty, but that he intended Mrs. Sutton should have it, and that he frequently spoke of them as "the children." .

Mrs. Williams, an insurance agent, while examining the house at the request of Mrs. Sutton, with reference to a policy, met Mr. Kenyon on the premises. He showed her over the house and directed her attention to certain alterations that the Suttons had made in the plan, and said: "It is as they want it; it is the children's; it don't make any difference to me how they fix it." And again she states that he said in regard to the gables that he would have made every one different, but the children (a phrase which he often used with reference to Mr. and Mrs. Sutton) wanted it so, and it did not make any difference to him; "it was theirs."

. To William K. Washburn, who was working about the grounds, Mr. Kenyon said that he was fixing it up for Mr. and Mrs. Sutton, that it was their place, and they were in possession.

In regard to some of the details, Mr. Eastman, another witness, testified that Mr. Kenyon said he had nothing to do with the building of it; that Mr. Sutton was building it for himself.

Mr. Anderson, a resident of Oconomowoc, testifies that he asked Mr. Kenyon, in a conversation that they had about the place now in dispute, if he felt anything like a Granger; and that his reply was that he could not say he did, as he did not buy the place for himself, but had bought it for Mrs. Sutton, who undoubtedly would be a permanent resident; although he should make it his home with them while there, as he had for several years made their place his home. In another conversation, Mr. Kenyon said to him that the building was much larger than they intended in the start, but he was building it entirely for Mrs. Sutton, and it had been enlarged at her suggestion; that Mr. Sutton had the entire control, and he had authorized him to build and finish it and make the improvements exactly as Mrs. Sutton wished. On his cross-examination he testified that Mr. Kenyon said he had bought it, but not for himself; that he had bought it for Mrs. Sutton, and they would make it a permanent residence, and he should make it his home with them whenever he was there.

Celestia Edwards testifies to a conversation with Mr. Kenyon about the property, in which he remarked that they would have a very beautiful place and home there, to which he replied that he liked it very well, but it did not make any difference to him; "it was all theirs, it was the children's; they were fixing it up just to suit themselves."

Clarence I. Peck also testifies to a conversation about this place, in which Mr. Kenyon said that he intended to finish it up in good style for "the children," as he called them; meaning Mr. and Mrs. Sutton; and also that he said on another occasion: "The place belongs to Charlie and Sortie, anyhow, and I thought I would give the job of superintending it to Charlie."

Some comment is made that the most direct testimony on the subject of a promise comes from the sister and brother-in-law of the plaintiff, but there is nothing to discredit their evidence, no impeachment of their character is attempted, nor is it shown that they are in any way dependent upon her. No reason is given why they should state anything false, and their testimony is wholly uncontradicted. It is also consistent with all the circumstances of the case.

It is further made a subject of comment that Mrs. Sutton did not make claim to the title to this property, nor bring this suit for two or three years after the death of Mr. Kenyon; but it is easy to suppose that she really believed that for want of a written promise or agreement she could not enforce her right to the property. While this principle of the necessity for a written agreement in regard to the title to real property is almost universally understood among all classes of people, however unlearned in the law, it is not very well known that there is an exception to it in the case of a promise, not in writing, but so far performed as to take it out of the Statute of Frauds.

On the whole, we think that the evidence justifies the inference that Mr. Kenyon, having a clear intention that this property should belong to Mrs. Sutton, bought it for her, and also promised her that he would make over the title to her upon consideration that she should take care of him during the remainder of his life as she had done in the past.

The decree of the Circuit Court is therefore        *Affirmed.*