## FAUNCE v. WOODS et al.

(Court of Appeals of District of Columbia. Submitted December 4, 1924. Decided May 4, 1925. Motion for Rehearing Denied May 23, 1925. Motion to Recall Mandate and Modify Judgment Denied May 29, 1925.)

No. 4100.

**1. Appeal and error ⟷847(1)—Equity proceedings are reviewable, on appeal, both on questions of law and fact.**

Equity proceedings are reviewable, on appeal, both on questions of law and fact.

**2. Appeal and error ⟷931(6)—On appeal in equity proceeding, trial justice presumed to have considered only competent evidence.**

On appeal in equity proceeding, it will be presumed that trial justice considered only competent evidence, notwithstanding receipt without objection of incompetent evidence, and the incompetent evidence will not be considered.

**3. Frauds, statute of ⟷71, 75—Statements evidencing intent to convey or devise realty insufficient to take parol agreement out of statute.**

Statements by decedent showing undoubted intent to make conveyance or devise to plaintiff are insufficient to take parol agreement to do so out of statute of frauds.

**4. Frauds, statute of ⟷129(4)—Parol agreement to convey realty, clearly established, enforceable, where delivery of possession has been made pursuant thereto.**

A parol agreement to convey realty, clearly established, may be enforced, where delivery of possession has been made pursuant thereto and acquiesced in by other party.

**5. Specific performance ⟷42—Parol agreement to convey realty may be specifically enforced, where promisee, with knowledge of promisor, has changed his position in reliance thereon.**

Parol agreement to convey realty may be specifically enforced, where promisee, with knowledge and consent of promisor, does acts pursuant to and in obvious reliance on agreement, which so change relation of parties as to render restoration of their former condition impracticable.

**6. Specific performance ⟷45—Plaintiff, seeking specific performance of parol agreement to devise or convey realty, held not to have changed her position in reliance on promise.**

Plaintiff, who, at time of her marriage, when over 30 years old, declined to leave decedent's employ and accompany her husband to another city, because decedent had agreed to make conveyance or devise of realty to her if she remained in his employ as long as he lived, and who did so continue in his employment at an increased salary until his death 18 months later, *held* not to have changed her position in reliance on such promise, so as to entitle her to enforce specific performance of it.

5 F.(2d)—48

**7. Specific performance ⟷41—Test of enforceability of parol agreement to devise realty stated.**

Test of enforceability of parol agreement to convey or devise realty is whether plaintiff under it could have come into a court of equity during decedent's lifetime and prevented him from disposing of property in manner which he deemed proper.

Bland, Acting Associate Judge, dissenting.

Appeal from the Supreme Court of the District of Columbia.

Action by Annie W. Faunce against Lillian A. Woods and others. From a decree of dismissal, plaintiff appeals. Affirmed.

D. T. Wright and Philip Ershler, both of Washington, D. C., for appellant.

J. A. Toomey and J. A. Davis, both of Washington, D. C., for appellees.

Before MARTIN, Chief Justice, VAN ORSDEL, Associate Justice, and BLAND, Judge of the United States Court of Customs Appeals.

VAN ORSDEL, Associate Justice. A bill in equity was filed in the Supreme Court of the District of Columbia by appellant, Mrs. Annie W. Faunce, to enforce the specific performance of a parol contract to convey or devise to her three lots situated in the city of Washington, Nos. 208, 210, and 216 L Street, Southwest. From a decree dismissing the bill, this appeal was taken.

It is averred in the bill that one Joseph H. Chivell was engaged in the business of a commission merchant, dealing in sea foods and game at his place of business on the water front at the Eleventh Street Wharves in this city; that Chivell was an uneducated man, incapable of keeping books, or carrying on written correspondence; that plaintiff entered his employment in the year of 1905, at the age of 16 years, in the capacity of bookkeeper, cashier, handler of his moneys and accounts, writing his letters, and attending to the details of his business; that plaintiff faithfully devoted all her time and attention to the said business, established a system of accounts and collections, attended to the credits, paid bills, and looked after the banking and financial matters generally in connection with the business; that upon one occasion she contemplated leaving his employ, when he stated to her that he would either deed her the three pieces of real estate in question, or would leave the same to her by will, if she would remain in his employ; that plaintiff accepted the offer and continued to work for him, devoting all her

time and energy to the business up until his death; that Chivell repeatedly reiterated his promise and agreement during his lifetime; that shortly prior to his death in 1921 he engaged one Thomas P. Brown, one of the defendants herein, to draw a deed for the property in question conveying the same to the plaintiff; that Brown prepared the deed and arranged to present it to Chivell for execution on the 3d day of May, 1921, but that Chivell died on that day before the deed was executed, leaving no will; and that plaintiff had faithfully discharged all the duties and obligations undertaken on her part to be performed under the agreement.

It further appears that plaintiff received wages from Chivell during her employment of $5 per week from the time she began work in 1905 until 1914, when her wages were increased to $15 per week, which continued until the time of her marriage in January, 1920, when, under a further agreement with her employer, her wages were increased to $25 per week, which continued up to the time of Chivell's death in May, 1921.

Coming to the evidence adduced to establish the making of the alleged agreement, it was stipulated that Brown prepared a deed and will for Chivell, which, because of his death, were never presented to him for signature or execution, and which he never saw. The witness Eyler testified that at the time of plaintiff's marriage she was away a week or so, and during that time Chivell told him that, if she stayed with him as long as he lived or was in business, he intended to turn over to her the three pieces of property.

Plaintiff testified to the character of work performed as set forth in the bill of complaint. In respect of the alleged contract she testified as follows: "Q. Tell all of the conversation that happened at the time of the talk between you and Capt. Joe, when your salary was raised to $25 after your marriage. A. Mr. Chivell asked me if I was going to leave his services, and he said, 'If you leave, I will have to close my business; I don't know anything about the business, and I couldn't run it;' and he said, 'If you will stay with me, I will make an agreement with you to give you those three houses on L street.' I said, 'I will make the agreement; I will stay with you until you or I die.'"

Witness David M. Faunce testified that Chivell told him in plaintiff's presence that he was going to give her the houses; "that happened a dozen times before he died. * * * He never told me right before Miss Annie that he was going to give her these houses more than two or three times; in the other conversations, when she was not present, he just told me what he was going to do, and that was all. * * * He told me that she had agreed to stay with him until he died."

The witness Abendschein testified that Chivell told him on one occasion, referring to plaintiff, " 'She has been with me ever since she was a little girl, and,' he says, 'I have deeded her three houses that, if she will stay with me, she gets it.' " The witness Stuart testified to a conversation with Chivell in which he said: " 'I have promised Miss Annie, or Mrs. Faunce, to give her three houses. I have promised, provided she will stay with me in my business; in my condition,' he said, 'I might as well close the doors without her, and she has promised me to stay;' and then, even then, he intimated that he hoped I would still use my advice or my influence with her husband to let her remain with him." Raymond T. Faunce, husband of the plaintiff, testified that, when he and the plaintiff were married, he desired to remove to Norfolk, but that she refused, "because she said she had an agreement with Mr. Chivell whereby she was going to stay with him until he died."

[1, 2] It will be observed that the only testimony of a meeting of the minds, of a direct positive agreement between the parties, is given by the plaintiff herself. She was an incompetent witness to testify to the contract, and while her testimony was not objected to, this is a proceeding in equity, tried to the court below, and reviewable in this court on both questions of law and fact. It will be presumed that the learned trial justice, in entering his decree, considered only the competent evidence that had been adduced, whether objections were interposed or not. Certainly this court, reviewing a proceeding of this sort, and before assuming to direct a decree below, will carefully scrutinize the evidence, and reject that which has been improperly admitted, whether over objection and exception or not.

[3] We will therefore not only assume that plaintiff's evidence respecting the making of the alleged contract was not considered by the court below, but we will refuse to consider it here. With this piece of testimony rejected, the disconnected evidence in regard to the alleged contract amounts to nothing more than declarations on the part of Chivell that, if plaintiff continued to look after his business as long as he lived, he would give her the three pieces of property, either by deed or devise. That he intended to do this there can be no question, but are

such mere statements and intentions sufficient to take the case out of the statute of frauds? We think not.

[4] In the case of Purcell v. Miner, 4 Wall. 513, 18 L. Ed. 435, the Supreme Court of the United States has announced in no uncertain terms the conditions under which the specific execution of a parol agreement for the purchase of lands may be enforced, in view of the provisions of the statute of frauds. In that case it is made clear that proof of such a contract cannot be made out by mere hearsay, or by evidence of declarations of a party to strangers to the transaction as a part of chance conversation. A parol agreement, clearly established, may, however, be enforced, where delivery of possession has been made in pursuance of the agreement and acquiesced in by the other party. But the possession must be actual, and "is not satisfied by proof of a scrambling and litigious possession."

The Purcell Case has been followed by the Supreme Court in a number of cases. In Brown v. Sutton, 129 U. S. 238, 9 S. Ct. 273, 32 L. Ed. 664, the court upheld a parol agreement to convey to Mrs. Sutton certain premises in part compensation for the services she and her husband had rendered to one Kenyon. The testimony showed that Kenyon had purchased the property and furnished the money for Mrs. Sutton and her husband to erect a house thereon. The house was erected in pursuance of the agreement. The agreement was proved by the statements made by Kenyon to others in relation to his agreement and his object in purchasing the property and erecting the house; but the court said: "Mr. and Mrs. Sutton were placed in possession of the premises as soon as the purchase was made, and they were living there at the time the present suit was brought."

[5] In Townsend v. Vanderwerker, 160 U. S. 171, 16 S. Ct. 258, 40 L. Ed. 383, the court held that payment of the consideration money is insufficient to remove the bar of the statute of frauds, but that such payment, accompanied by possession under the contract, constitutes such a part performance as will support a bill for specific performance. The court also recognized another principle that has grown up, especially in the state courts, authorizing the enforcement of specific performance in cases of this sort, where the party to whom the promise is made, with the knowledge and consent of the promisor, "does acts pursuant to and in obvious reliance upon a verbal agreement which so change the relations of the parties as to render a restoration of their former condition impracticable, it is a virtual fraud upon the part of the promisor to set up the statute in defense, and thus to receive to himself the benefit of the acts done by the plaintiff, while the latter is left to the chance of a suit at law for the reimbursement of his outlays, or to an action upon a quantum meruit for the value of his services." But the court adds that "the entry into possession of the land and the making of valuable improvements thereon is treated by all the cases as one of the most satisfactory evidences of part performance, and entitling plaintiff to a decree in his favor."

These decisions were not changed or modified in the case of Whitney v. Hay, 181 U. S. 77, 21 S. Ct. 537, 45 L. Ed. 758. In that case, in pursuance of a parol agreement between one Piper and Hay, Piper purchased the lots in suit, built a house thereon, in which he and his wife were to reside with Hay and his wife in consideration of Hay's caring for them. Hay was put in possession of the property and resided thereon. While Hay was in actual occupancy of the premises and carrying out his agreement, Piper put the title to the property in his niece, the party Whitney. The bill charged that the transfer to Whitney was made for the purpose of defrauding Hay. The court accordingly, applying the rule laid down in the Purcell Case, upheld a decree declaring that Whitney held the title in trust for Hay.

[6] In the present case there is nothing to show that the alleged contract tended in any respect to change the course of plaintiff's life, or operated to her material disadvantage. The change in such cases must be induced by the contract, or the contract must be induced by a change that has already taken place. Neither of these conditions is met in this case. Nowhere is it contended that this alleged contract was made as the result of the years of service which plaintiff had rendered prior to that time. It is alleged to have been made as an inducement for plaintiff to continue her services from the time of her marriage as long as Chivell lived, a period of about 17 months. The only testimony tending to show any change in the plans of the plaintiff, at that time over 30 years of age, is by her husband, who testified that he desired her to go to Norfolk with him after their marriage, but she refused on the ground that she had agreed to stay with Chivell. This does not amount to such a change in the course of service and the life of the plaintiff as would justify the invocation of this exceptional rule of equity.

Especially is this true in plaintiff's case, when, as an inducement for her remaining after she was married, her wages were increased from $15 to $25 per week.

None of the conditions is here present to clear this case of the operation of the statute of frauds. Plaintiff was not placed in possession of the property, nor were the relations of the parties so changed that the strict application of the terms of the statute results in the perpetration of a fraud upon the plaintiff. According to her claim, the alleged contract was made less than 18 months prior to Chivell's death, and her course of service was not materially different during that period from what it had been during her previous employment. Nor does it appear that any loss, damage, or inconvenience was sustained, either to herself or her husband, as the result of their remaining in Washington, instead of going to Norfolk.

[7] We think it is clear, therefore, that plaintiff is not entitled to equitable relief. This alleged agreement never affected the real estate in question, or the title to it, in such a manner as would have enabled plaintiff to have come into a court of equity during the lifetime of Chivell, and prevented him from disposing of the property in any way he might have deemed proper. This, we think, is a competent test to apply in a case of this sort.

The decision is affirmed, with costs.

BLAND, Acting Associate Justice (dissenting). It is with regret that I dissent from the conclusions reached by my learned associates. The manifest injustice which results in this particular case, and may result in other injustices, if the views expressed in the ruling opinion become settled law in this jurisdiction, compels me to point out in three particulars, especially, where my associates have erred in their pronouncement of the law.

I desire to point out now, and to elaborate upon more fully later, the three chief instances in which the ruling opinion, in my judgment, does not state the law:

First. In intimating, if not deciding, that delivery of possession (emphasizing Purcell v. Miner, 4 Wall. 513, 18 L. Ed. 435, on this point) was indispensable to taking the case out of the statute of frauds.

Second. In refusing to consider the testimony of plaintiff concerning her agreement with deceased when the same was in the record, without objection, and after it had been considered by the court below, and an affirm-

ative finding made by it that the contract was clearly proved.

Third. In deciding that plaintiff's relations were not so changed as that the failure to specifically enforce the contract would perpetrate a fraud upon her.

This was a suit in equity in the Supreme Court of the District of Columbia against the heirs of Joseph Chivell, deceased, for specific performance of a parol contract made by Chivell with the plaintiff to convey or devise to her three houses in the city of Washington upon the consideration that plaintiff would continue to devote her time and services to his business and care for him as long as he lived. At the conclusion of plaintiff's testimony the court dismissed the bill. The opinion of the court was filed July 14, 1923, and is as follows:

"The contract made after plaintiff's marriage is clearly proved, but cannot be enforced, unless the law as laid down by the Supreme Court of the United States is ignored. In Purcell v. Miner, 4 Wall. 513, 517, 18 L. Ed. 435, the court says: 'The statute, which requires such contracts to be in writing, is equally binding on courts of equity as courts of law. Every day's experience more fully demonstrates that this statute was founded in wisdom, and absolutely necessary to preserve the title to real property from the chances, the uncertainty, and the fraud attending the admission of parol testimony. It has been often regretted by judges that courts of equity have not required as rigid an execution of the statute as courts of law.' After stating that in many instances courts of equity have relaxed the rigid requirements of the statute, the court states that several things must be shown before equity will grant relief and one is that delivery of possession has been made in pursuance of the contract and acquiesced in by the other party. Subsequent cases in that court and in the Court of Appeals have not departed from the rule. Brown v. Sutton, 129 U. S. 238, 9 S. Ct. 273, 32 L. Ed. 664; Townsend v. Vanderwerker, 160 U. S. 171, 16 S. Ct. 258, 40 L. Ed. 383; Whitney v. Hay, 181 U. S. 77, 21 S. Ct. 537, 45 L. Ed. 758; Cherry v. Whalen, 25 App. D. C. 537. For a valuable discussion of the question by Prof. Pound, see 33 Harvard Law Review, 933; also 1 Williston, Contracts, § 494."

Joseph Chivell, 20 years prior to his going into the commission business, selling fish and sea foods, had been a fisherman and an oyster runner up and down the Potomac river, and sold his product to the commission houses in Washington. He had little, if any,

education, and knew very little about business. He could not write, and was taught to sign checks in an indifferent manner by the plaintiff during her employment by him, which employment covered a period of 16 years.

Plaintiff, known as Miss Annie by all the old fishermen and boatsmen at the wharf, began working for Capt. Chivell when she was about 15 years of age, or about the year 1905. The witnesses describe her at that time as a little girl in knee dresses, with a plait hanging down her back. Capt. Chivell could not keep the accounts himself. She taught him a little, but he never learned to write, except his name, and when she began to work for him he kept no books at all. Miss Annie had no one to teach her how to keep the books and accounts, but she worked out a plan to do so. She handled the bills, kept the books, put the money in the bank, waited on customers, got up orders for hotels, counted out barrels of clams, washed them, and oftentimes bought them and went down into the holds of vessels for that purpose. She grew into the business and became a part of it, and from the evidence it would seem that she became the main part of it. She regarded Capt. Chivell as her foster father, called him "Papa," and he regarded her as his daughter, having no children of his own or near relatives for whom he cared, judging from the will, except his wife, who is not concerned with this action.

Capt. Chivell's business prospered. He was paying Miss Annie $5 per week until the war broke out in 1917, and the telephone company offered to hire her at $17 per week. Capt. Chivell was alarmed at the prospect of her leaving, and stated he would have to close up the business if she quit him, and begged her to remain. The testimony as to the date of the first contract is not clear, but there are fair inferences that at this time, or at some subsequent time, and prior to her marriage, he made an oral agreement with her to the effect that, if she would stay with him until he died, he would give her the three pieces of property in controversy. She worked for him until her marriage for $15 per week, when most young women in Washington were receiving, for eight hours' work $1,200 and larger sums per year.

Capt. Joe as a fisherman had been in the habit of going without a coat in cold weather, and he was careless about looking after the requirements of health. The plaintiff testified that, thinking as much of him as she did her own daddy, she would go out after him and make him keep his coat on; that she made him take his medicine, 'phoned the drug store for the medicine, and ordered the coal for his residence, at the request of Mrs. Chivell.

Miss Annie was married on January 5, 1920. Prior to her marriage, Mr. Faunce, her husband, talked with Capt. Chivell about his wife leaving him in the event they were married. Chivell again stated that, if she stayed with him, he was going to give her the houses. After Mrs. Faunce was married, her husband demanded that she quit the employment and go with him to Norfolk, Va. Capt. Chivell solicited and obtained the intermediation of their mutual friends on the wharf to persuade Mrs. Faunce to stay with him, often repeating that he could not get along without her and would close the business if she quit. After talking to mutual friends who approached her on the question, she again had a talk with Capt. Chivell, and he again stated to her, if she would stay with him, he would give her the three houses on L street, and she then told him she would stay with him upon those terms until he or she died.

As the business grew, and as Capt. Chivell became more infirm, the responsibility of caring for the business and caring for him became a greater burden upon her. Before he was stricken with paralysis in December, 1919, she not only did most of the buying and conducted most of the business, although he was present most of the time, but she cared for his personal comforts and looked after him as a daughter would her own father. After he was stricken with paralysis, he and Mrs. Chivell seemed to lean on Mrs. Faunce as their chief support and comforter, not only in a business way, but with reference to many of their personal needs. The record is full of praise from every witness that touched the question of her tireless devotion and self-sacrificing services to these old and dependent people. On numerous occasions Capt. Chivell declared his intentions of giving her the real estate, and on some occasions spoke of it as if he had already done so.

After her marriage, and after the paralytic stroke, she went to work at 6 o'clock in the morning and took care of the business, and attended to the wants of the old people in an exceptional and unusual way. She assumed entire responsibility of the business, hired and discharged the employees, and remained at the commission house until the drivers of the delivery wagons had returned and reported. Then, at 6 or 7 o'clock at night she would take books and papers and go to the Chivell home, and talk with him

for an hour or two about his business, and satisfy his mind and comfort him. She had no regular hour to quit work. After he became sick, she borrowed the money necessary for the handling of the business, and she wrote all the checks. One witness testified that he heard Capt. Chivell say that she was more than a daughter to him, and that she saw to it that he took his medicines regularly, made him change his shoes when his feet were wet, saw to it that he did not go out without his coat on, made him go to the dentist, and saw to getting the automobile out, for his recreation, and that she looked after him in every manner. The husband, Raymond T. Faunce, frequently urged his wife to quit the employment and go with him, but she steadfastly refused to do so, and he finally acquiesced in the situation and agreed with her that it was her duty to stay. After her marriage, and during the time she worked for Capt. Chivell, the plaintiff did not have a home of her own, but lived with her mother-in-law. After Capt. Chivell died, she kept house for her husband, and a part of the time helped her husband in his business at the market.

During the latter years of his life, Capt. Chivell stated, to those who asked him why he did not make the deed, that he intended to do so, but he wanted to be sure she did not leave him. Months before he died, at Chivell's request, Thomas P. Brown, defendant, caused to be prepared, by James A. Toomey, defendants' lawyer in this case, a deed conveying the real estate in controversy to Mrs. Faunce, and also a will which does not dispose of the land covered by the deed to Mrs. Faunce, in which will he bequeathed to Thomas P. Brown the fish and oyster business as a trust to be managed by him for the benefit of Mrs. Chivell and plaintiff in equal shares, during the life of his wife, and at her death to convey and turn over the entire business to the plaintiff. The remainder of his estate was also turned over to Thomas P. Brown for trust purposes, and to eventually go to plaintiff and to persons other than the defendants. The defendants, who were distant relatives, through a deceased half-sister, were to receive $10 each.

On the day Chivell died he stated to a witness, while standing in front of witness' house, just across the street from his own house: "I am waiting for Brown to come down here, I want to sign some papers, my will; he promised to bring them down last week, and when he came he said he had forgotten them. I am going home and let it go." About a couple of weeks before he

died he told this witness that he had told Brown to draw up the papers. By stipulation Brown's testimony is admitted as follows: "On several occasions in a period of four months prior to Joseph H. Chivell's death, he (Chivell) had requested me to prepare deeds conveying to the plaintiff the real estate described in the bill. Chivell told me that he had promised the real estate described in the bill to the plaintiff. I had the deeds and the will prepared, and went to Chivell's house on the day of his death, but at the time I arrived there he was unconscious. Mr. Chivell directed the deed to be drawn to me as trustee during Mr. Chivell's lifetime, as the deed now appears. He also dictated and directed the terms of the will as it now appears in that paper. Mr. Toomey drew the deed and the will."

The sole question for determination in this case is: Will a bill in equity lie for specific performance of the oral agreement affecting the title and control of the real estate under such circumstances as are disclosed by the admitted facts in this case, when the statute of frauds is interposed as a defense? Section 1117 of the Code of the District of Columbia is similar in every particular to the English statutes and to those in most jurisdictions, and is as follows: "No action shall be brought * * * upon any contract or sale of lands, tenements, or hereditaments, or any interest in or concerning them * * * unless the agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, which need not state the consideration, and signed by the party to be charged therewith or some other person thereunto by him lawfully authorized."

I approach the question under the above unusual statement of facts with full consciousness that there are few, if any, statutes that have received so much consideration by the courts, resulting in so much conflicting reasoning and results. The statute of frauds and perjuries has found its permanent place in English and American law by reason of the imperative necessity for this kind of legislation, in order to prevent fraud and perjury, and the resulting uncertainty in property rights. No legislative enactment has been more stoutly defended by the courts, or has received more unqualified approval by them, than have these few plain, but forceful, words. Their commanding mandate throughout the years has perplexed the judicial mind in its effort to mete out justice and equity without destroying their beneficent influence. The statute applies

both in cases at law and in equity. Equity courts, however, have certain inherent power not exercised by courts of law. These powers are only exercised in the sound discretion of the court, where remedies at law are inadequate.

The statute itself says nothing about "part performance" or "delivery of possession" making an exception to the general provisions of the statute, so that oral agreements may be the basis for an action, and yet the books are full of well-considered decisions, from the lowest to the highest courts of our land, where in equity parol agreements without a single written word have been enforced, regardless of the positive and definite wording of the statute. The court below dismissed the bill of equity, apparently and solely upon the ground that possession of the real estate in controversy had never been delivered to the plaintiff, and upon the authority of Purcell v. Miner, 4 Wall. 513, 18 L. Ed. 435.

It is my view of the case that the court misinterpreted the meaning of this decision when it held in substance that no specific performance could be ordered by a court of equity for the transfer of real estate upon an oral agreement, in any instance, unless possession was delivered. True enough, some appellate courts have likewise been influenced somewhat by this view of the decision. I think, as applied to this case, that the following general principle of equity is supported by the weight of authority, and is the law, under statutes similar to the one at hand, for the guidance of this court. Equity courts will in this class of cases specifically enforce a parol agreement, if the same agreement in writing could be so enforced, at the insistence of a complainant who has completely performed, and has so fully performed as to irretrievably change his situation to his disadvantage, so that the failure to perform would work a fraud upon him and leave him with no adequate remedy at law. Williams v. Morris, 95 U. S. 444, 24 L. Ed. 360; Sears v. Redick, 211 F. 856, 128 C. C. A. 234; Brown v. Sutton, 129 U. S. 238, 9 S. Ct. 273, 32 L. Ed. 664; Whitney v. Hay, 181 U. S. 77, 21 S. Ct. 537, 45 L. Ed. 758; same case below 15 App. D. C. 164; Cooper v. Colson, 66 N. J. Eq. 328, 58 A. 337, 105 Am. St. Rep. 660, 1 Ann. Cas. 997; McKinley v. Hessen, 202 N. Y. 24, 95 N. E. 32, 68 N. Y.; Rhodes v. Rhodes, 3 Sand. Ch. (N. Y.) Star Page 279; Hall v. Gilman, 77 App. Div. 459, 79 N. Y. S. 303; Johnson v. Riseberg, 90 Neb. 217, 133 N. W. 183, 38 L. R. A. (N.

S.) 752; Teske v. Dittberner, 70 Neb. 544, 98 N. W. 57, 113 Am. St. Rep. 802; Schoonover v. Schoonover, 86 Kan. 487, 121 P. 485, 38 L. R. A. (N. S.) 752; Svanburg v. Fosseen, 75 Minn. 350, 78 N. W. 6, 43 L. R. A. 427, 74 Am. St. Rep. 490; Lothrop v. Marble, 12 S. D. 511, 81 N. W. 885, 76 Am. St. Rep. 626; Howe v. Watson, 179 Mass. 30, 60 N. E. 415; Berg v. Moreau, 199 Mo. 416, 97 S. W. 901, 9 L. R. A. (N. S.) 157; Gladville v. McDole, 247 Ill. 34, 93 N. E. 86; Townsend v. Vanderwerker, 160 U. S. 171, 16 S. Ct. 258, 40 L. Ed. 383; McQuitty v. Wilhite, 247 Mo. 163, 152 S. W. 598; Pomeroy on Specific Performance, Sec. 107, p. 152; Newbold v. Michael, 110 Ohio St. 588, 144 N. E. 715; Cherry v. Whalen, 25 App. D. C. 537.

This now well-settled doctrine has been impelled by the force of the equity principle, which has become a maxim, that the statute of frauds, being designed to prevent fraud, will not be permitted to work a fraud upon one asking equitable relief. Regardless of whether this is court-made law or not, or legislation by the courts, so indelibly has it become a part of our well-settled law that it is no longer to be questioned. The courts early arrived at the conclusion that the legislative bodies never intended the statute of frauds to be used as an instrument of fraud. Courts of equity, who must look to the substance and not to the form, have given relief from the statute of frauds where its provisions have weighed down with crushing effect upon the supplicant for justice upon the theory that the law will work injustice to no one. "Lex nemini operatur iniquum." So in all the cases worthy of notice, where the courts have upheld an oral agreement, disregarding the letter of the statute, it has been on the theory, either expressed or implied, that to permit the statute to compel denial of the relief would work an unconscionable fraud.

In Purcell v. Miner, supra, it is true that the court stated that delivery of possession pursuant to the contract was essential, but a careful reading of the case will disclose that the question of possession there was interlinked with and a part of the evidence to sustain the proof of the making of the oral agreement, and the court said that the possession under the facts in that case must be acquiesced in by the other party, and that proof of a litigious possession would not be satisfactory. In other words, if the complainant relied upon evidence of possession to establish the fact that an oral agreement was entered into, or if he relied upon de-

livery of possession as proof that the complainant, by part performance of the oral agreement, had been placed in a position where it would be a fraud upon him for the agreement not to be carried out, then that proof of possession must be of the character indicated.

In my judgment, this case does not hold that the only part performance which will take a case out of the statute of frauds is the delivery of possession. The same court, 11 years later, with one-half of the same personnel, said: "Diversity of decision undoubtedly exists; but this court decided, in the case of Purcell v. Miner, 4 Wall. 513, that the proof as to the terms of the contract must be clear, definite, and conclusive, and must show a contract, leaving no jus deliberandi or locus pœnitentiæ; that it cannot be made out by mere hearsay or evidence of the declarations of a party to mere strangers to the transaction, in chance conversation, which the witnesses have no reason to recollect from interest in the subject-matter, and which may have been imperfectly heard or inaccurately remembered, perverted, or altogether fabricated; that the proof must also show that the consideration has been paid or tendered, or that there has been such part performance of the contract that its rescission would be a fraud on the other party, which could not be compensated by the recovery of damages; *or* that the delivery of possession has been made in pursuance of the contract, and has been acquiesced in by the other party. (Italics mine.) Tested by these considerations, it is clear that the attempt to prove a written contract utterly fails, and that there is no satisfactory evidence to prove any such part performance of the supposed contract as will take the case out of the operation of the statute. Where the attempt is to take the case out of the statute upon the ground of part performance, the party making the attempt must show by clear and satisfactory proof the existence of the contract as laid in his pleading, and the act of part performance must be of the identical contract which he has in that manner set up and alleged. It is not enough that the act of part performance is evidence of some agreement; but it must be unequivocal and satisfactory evidence of the particular agreement charged in the bill or answer." Williams v. Morris, 95 U. S. 444, 24 L. Ed. 360.

In Purcell v. Minor, a real estate trade was involved where possession would ordinarily be delivered at once, while in cases like the one at bar possession is not contemplated until after death of the promisor. See Gladville v. McDole, 247 Ill. 34, 93 N. E. 86; Schoonover v. Schoonover, 86 Kan. 487, 121 P. 485, 38 L. R. A. (N. S.) 752. The rule is different in these two classes of cases, according to some authorities. Gladville v. McDole, supra. Usually the unconditional delivery of possession and acquiescence in the possession will put a party in a position where a failure to carry out the agreement would leave him without a remedy at law, and would perpetrate a fraud upon him, but under the authorities the delivery of possession even though not litigious, and even though absolute and acquiesced in, in many cases would not be sufficient part performance within itself. There must be other equities and other conditions recognized by the courts as indispensable.

Let us look to the logic of the question. Does the statute make an exception in cases where possession is delivered? No; no more than it does where the complainant is otherwise led into irreparable damage. Then upon what logic would the court hold that taking possession was indispensable to taking the case out of the statute of frauds, when other acts and facts, far more convincing of irreparable harm and of the actual making of the agreement, would be rejected?

In the case at bar there can be no other reasonable belief than that Capt. Chivell entered into the oral agreement to give complainant the real estate. That the agreement was definite and certain, and that to his dying hour he had intended to carry it out, is nowhere denied, except in the formal answer of the defendants. That no successful denial of its existence could be made is too plain to permit of controversy. The deed and will, though unsigned, admitted in evidence without objection, drawn by one of the attorneys for defendants at the request of one of the beneficiaries in the will, removes all possibility of even a suspicion that Mrs. Faunce has made false claim against the heirs of the deceased. No delivery of possession is necessary to establish the contract, nor is it, in my view of the facts, necessary to sustain the contention that Mrs. Faunce has been placed in a position where the failure to carry out the specific agreement would work an unconscionable fraud upon her.

If there was any reasonable doubt in the mind of the trial court that the contract might not have been made, and that there was room for perjury and fraud against the heirs of the deceased, clearly it would be its duty to refuse to grant the prayer. Berg v. Moreau, 199 Mo. 416, 97 S. W. 901, 9 L.

R. A. (N. S.) 157. And while the courts in some jurisdictions have permitted the parol contract to be established by evidence upon which I would not look with favor, I wish to emphasize that, since the statute is designed to prevent fraud, it is only in a case where there is no probability of fraud (and I am almost constrained to say no possibility of fraud) that the courts should enforce a parol agreement.

The majority opinion and the court's finding against appellant is chiefly based upon and controlled by the proposition that the agreement between the parties was not clearly proved. I will not review the evidence here, but the numerous statements and facts in the record tending to prove the agreement between the parties are so conclusive and convincing that the making of the agreement is not questioned in the trial of the case, and that there was an agreement, clearly proved, was affirmatively found by the court below.

The ruling opinion concludes that there is but one question and answer in the evidence which, if considered by this court, could be regarded as proving the agreement. This was the question propounded to and answered by the plaintiff, Mrs. Faunce. To this question and answer there was no objection, nor was there, at any time, any motion to strike out same, nor was there, at any time, any question raised as to its competency. The majority opinion finds that she was an incompetent witness to testify concerning her agreement with Chivell. With this I will agree, if proper objection was made. I disagree with the statement that "it will be presumed that the learned trial justice, in entering his decree, considered only the competent evidence that had been adduced, whether objections were interposed or not." Since the lower court found affirmatively that the contract was clearly proved, I would presume that it took cognizance of the question and answer, to which there was no objection made.

The appellate court has no right to refuse to consider evidence which would be incompetent if objected to, but which is in the record without objection or without motion to strike out. It would seem hardly necessary to cite authorities on this almost primary principle of law. There are no citations supporting the position taken in the majority opinion. The rule seems to be universally adhered to in all jurisdictions that objections cannot be made, for the first time in the appellate court, to incompetent evidence, made incompetent by statute. The failure to object to incompetent evidence waives its incompetency, and on appeal courts have no right to disregard it. The reason for this would seem to be manifest. The party being entitled to object might desire the evidence for some purpose of his own. By failing to object he might obtain the benefit of it. He may, under the Code of this District, call the witness and make her competent, or, by cross-examination, he could so open up the question as to make competent her testimony as to the full conversation between her and the deceased.

The proposition that the testimony of a party to a transaction with a deceased person, if not objected to in proper time, is waived, and will be considered and given such weight as his interest in the suit and other circumstances will allow, is sustained by the decisions in all jurisdictions in which I have examined the opinions. Chapman v. Peebles, 84 Ala. 283, 4 So. 273; Doty v. Doty, 159 Ill. 46, 42 N. E. 174; Hipple v. De Puie, 51 Ill. 528; Wingo v. Caldwell, 35 S. C. 609, 14 S. E. 827;[1] Clarke v. Alexander & Wright, 71 Ga. 500; Howatt v. Green, 139 Mich. 289, 102 N. W. 734; Moody v. Dryden, 72 Iowa, 461, 34 N. W. 210; Carney v. Carney, 95 Mo. 353, 8 S. W. 729; Simmons v. Simmons, 33 Grat. (Va.) 451; Bartlett v. Burden, 11 Ind. App. 419, 39 N. E. 175; Parrish v. McNeal, 36 Neb. 727, 55 N. W. 222; Harwood v. Hunt, 221 Mich. 349, 191 N. W. 19; Imboden v. Trust Co., 111 Mo. App. 220, 86 S. W. 263; Cowles v. Cowles, 81 Vt. 498, 71 A. 191; 40 Cyc. 2351, 2352; 1 Wigmore on Evidence, § 18.

Practically every one of the cases above cited were concerned with the evidence of a living party interested in the litigation as against the interest of one deceased. The nearest approach to a decision on this question, by this court, which I have been able to find, as affecting section 1064 of the District Code, is in Mankey v. Willoughby, 21 App. D. C. 314, which held that evidence, such as is in consideration here, would not be admissible *if excepted to*. If the conclusion adopted by the majority opinion is the law with reference to the consideration appellate courts will give evidence, to which there has been no objection, I have been unable to find a statement of it in any of the authorities examined. Section 1064, which says, "the other party thereto shall not be *allowed to testify* as to any transaction," etc. is in substantially the same language as has

---

[1] Reported in full in the Southeastern Reporter; not reported in full in South Carolina Reports.

been written into the law of almost every state in the Union.

In construing these words I cannot give my consent to a statement of law, unsupported by authority, which makes the rule for the District of Columbia different from that in all other jurisdictions. Having arrived at what I believe to be the law governing this case, let us see if the facts bring us within the law. Was the contract made? Yes; beyond the peradventure of a doubt. Was it fully performed on the part of plaintiff? Yes; and in such a way as to no doubt pull at the heartstrings of the trial court, who felt, by reason of what it believed to be the settled law, that it was unable to grant relief. A reading of the record during the taking of the testimony discloses how the unquestioned equities of the complainant appealed to the trial court in such a way that, had it believed that possession was not essential, it would have unhesitatingly granted the decree prayed for.

Capt. Chivell had no children, and this faithful, devoted foster-daughter, who became indispensable to him in both a business and social sense, was doubtless by him led to believe that her unusual sacrifices would be repaid in the generous manner promised. It is essential, I think, to the recovery in this case, that the services were rendered in performance of the contract and were consistent therewith. Williams v. Morris, supra. The length of service, if sufficient to justify the equitable demand and also sufficient to change the station in life, or the future of the complainant, is not material. Hall v. Gilman, 77 App. Div. 459, 79 N. Y. S. 303; Howe v. Watson, 179 Mass. 30, 60 N. E. 415. The first 12 years of the service has little to do with the case, except that in summing up the equities I am not unmindful of the fact that the property in controversy and the prosperous condition of the old captain at the time of his death surely were largely due to the unusual service of the young girl, and these years of service, showing as they do, the relations between the parties, fortify the evidence to the effect that the contract was made, and reflects upon the indispensability and value of her services after the contract was made. Courts of equity, in cases where the contract relates to service (although I have found none exactly similar to the case at bar), refuse to grant equitable relief where the services rendered were not of unusual character, and leave the complainant to his remedy at law. Cooper v. Colson, 66 N. J. Eq. 328, 58 A. 337, 105 Am. St. Rep. 660, 1 Ann. Cas. 997; New-

bold v. Michael, 110 Ohio St. 588, 144 N. E. 715.

In the case of Cooper v. Colson, supra, in a jurisdiction where this question has repeatedly been considered with much care and ability, the above conclusions are most forcefully stated. There the services consisted of a woman acting as housekeeper only a short time upon a parol promise to convey all property. The court, after announcing the well-settled rule, properly held that her services were in no sense unusual, and that she had "in no way changed her mode of living, or course of life, or life work." If, however, the services are of unusual character and the party rendering them in conformity to the agreement, has been placed in the position where he does not have an adequate remedy at law and has changed his station in life, then the courts, on the ground that it would be a fraud against the complainant to deny the relief, have compelled specific performance. Rhodes v. Rhodes, 3 Sand. Ch. (N. Y.) *279.

This leads me to the only question in the case that might be the subject of conflicting opinion. Were the services of Mrs. Faunce unusual, or such that could not be readily estimated in an action at law, and was she by her services and her full performance of her part of the contract so changed in her course of life as will warrant the intervention of equity? Her services were most unusual, not only in a business way, but unusual in the loving care and devotion to the personal ties of friendship and daughterly relation that existed between them.

Ordinary wages paid for clerical or domestic help, as far as I have ever known, do not secure services of the character here rendered, nor can such unusual services, which brought great happiness and prosperity to the deceased, be adequately measured in damages, or compensated for in an action at law. How would a jury estimate the value to his business interests of the late hours, of the drudgery, of the self-sacrificing application, prompted by a sense of duty and love, that does not characterize clerical or domestic service in general? No matter what instructions were given by the court, by what measure would a jury estimate the value of the comfort and peace of mind to this old gentleman in the closing years of his life, which came from this service of kindness and attentiveness, both at his place of business and at his home, when he was worried and restless because of his inability to keep in touch with his own affairs? What instructions could the court give which would insure

a fair and proper valuation of the services? The figure arrived at would be the result of speculation and a compromise between emotion and practicability. The only adequate remedy is the payment to her of the price both parties intended. She had no remedy at law, because a remedy that is inadequate, illogical, and unfair is not a remedy. 21 Corpus Juris, 50.

Did her services materially change her position in life? We do not need to speculate as to what she might have done when the war came on. With her conceded ability and energy, and the opportunities that were before her, she no doubt would have so shaped her course that her life would have been at least different. Suppose the deceased had not urged and caused others to urge her husband to agree to her services, and suppose she had refused to accept the terms of the agreement, and had obeyed her husband and gone to Norfolk, and had either gone in business or had kept house for her husband; can there be any reasonable doubt that her life would have been different? At the time Mrs. Faunce testified, she was 34 years of age, a middle-aged woman. The shadow of her long, hard service was still over her. Her performance of the contract changed her station in life, no doubt, mentally, physically, and financially, and it would be an unconscionable fraud upon her to deny her the full measure of compensation agreed upon.

The statute of frauds, while universally conceded to be wise and wholesome in its purpose and application, is not sacrosanct. The courts have found its terms sufficiently flexible to admit of such application as to prevent fraud and injustice in clear and appealing cases. Statutes of Limitation are equally positive in their terms and indispensable for the security of property rights; yet, where a party, through fraud, has been led not to bring the action within the time specified, the courts will uphold an action brought after the limitation has expired. To do otherwise, in my judgment, would be to admit the impotency of our judicial system to render justice between men.

It may be urged that, on the whole, it is better for the welfare of the citizen that the letter of the statute be carried out, even if some injustice prevails, and that to make an exception is to invite the final destruction of the wholesome law. It is too late to make this argument here. The courts for many generations past have softened the harshness of its literal application. The question, with-

in certain limitations, must be left to the sound discretion of the equity court, and sympathy alone must not be controlling. He should and must be guided by those wholesome principles, tested by logic and experience, and laid down in the books for our guidance.

The cases of Newbold v. Michael and Cooper v. Colson, supra, are strongly relied upon by appellees, not as supporting the case of Purcell v. Miner, supra; but they are urged as controlling on the theory that the services rendered and the consideration for the oral contract in the case at bar were not unusual, and could be compensated for in an action at law. These two cases probably more clearly state the crystallized principles of law on the question of the enforcement in equity of parol agreements affecting real estate than any other decisions found in the books, and the conclusions of law arrived at by me here are largely based upon, and I believe in entire harmony with, them. In the Newbold Case, the question of possession was not involved. A woman, for a year and a half, kept house for an old man. The court held that this was a common occurrence, and that actions at law were frequently brought in this kind of case, and that it was the province of the jury to fix the value of the ordinary things of life, and of ordinary service. In the Cooper Case, the same kind of housekeeping service for an old man by a housekeeper was viewed, no doubt, with equal suspicion, and the court held there that her services were not unusual, and that they did not change her course in life or mode of living, and that the services she rendered were of such character as to be easily and adequately compensated on the quantum meruit.

If the services in the case at bar were no more unusual, and would as easily admit of compensation, as were the services in the two cases, supra, I would be constrained to decide against the appellant. Here no undue influence, or the possibility of fraud, can be entertained for a moment, and the services were most unusual and extraordinary.

The decree of the court below should be reversed, with instructions to enter a decree in this case, ordering and directing the defendants to execute and deliver to the plaintiff a deed in fee simple, conveying the premises described in the bill, with title, clear, free, and unincumbered, which decree should specify that, in case of default on the part of defendants, the decree be ordered and directed to operate as such deed.