# WHITNEY *v*. HAY.

APPEAL FROM THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA.

No. 112. Argued November 15, 16, 1900.—Decided April 8, 1901.

Doctor and Mrs. Piper, each somewhat advanced in years, were without children and had no kin to whom the husband wished to bequeath his estate. They desired the comforts and happiness of a home in which they could have the sympathy, attention and care of younger people, upon whom they could look as their children. The property in question in this suit was purchased by the Doctor, in execution of an agreement in parol between him and the appellee, whereby Piper and his wife were to become members of Hay's household in Washington, and to be supported, maintained and cared for by Hay during their respective lives, in consideration of which Piper was to convey by will, or otherwise, to Hay all of his property of every kind and wherever situated. In part execution of that agreement Piper purchased the lots in question in this suit and built a house thereon, and in further execution of it he put Hay in possession of the lot and house to be occupied by Hay and his family in connection with Piper and his wife. While Hay was in the actual occupancy of the premises as his home, (which occupancy existed when this suit was brought,) Piper, in violation of his agreement, put the title to the property in his niece, the plaintiff in error. The bill alleged the foregoing facts, and that the transfer to the plaintiff in error was made solely for the purpose of defrauding the defendant in error. *Held :*

(1) That the alleged agreement with Piper was proved to have been just as stated by Hay;

(2) That the failure of Piper to invest Hay with the legal title was such a wrong to the latter as entitled him to the protection which would

be given by a decree specifically declaring that the defendant holds the title in trust for him;

(3) That such relief is consistent with the objects intended to be subserved by the Statute of Frauds;

(4) That the alleged agreement, being one which a court of equity would specifically enforce, if it had been in writing, and it having been partly performed by Hay in reliance of performance by Piper, and Hay being ready and willing to do what, under the agreement, remained to be done by him during the lives of Doctor and Mrs. Piper, he was entitled to the decree of the court below in his favor.

THIS suit was brought to obtain a decree declaring that the defendant Whitney held in trust for the plaintiff Hay the title to certain lots, with the building thereon, situate on Corcoran street in the city of Washington.

By a final decree in the Supreme Court of the District the relief asked was given—that court adjudging that the defendant Whitney, within a time named, make, execute and acknowledge a deed of conveyance of the premises to the plaintiff Hay, and that in default thereof the decree should have the same effect as if such conveyance had been made.

Upon appeal to the Court of Appeals of the District the decree of the Supreme Court was affirmed, an elaborate opinion on behalf of the appellate court being delivered by Mr. Justice Shepard. 15 App. D. C. 164, 173.

The principal facts upon which the plaintiff relies in support of his suit will appear from the following statement based upon the record:

Circumstances not necessary to be detailed brought Piper and Hay into each other's society while the latter was in the West, with the result that Doctor and Mrs. Piper conceived and expressed the warmest affection for Mr. and Mrs. Hay and in many ways indicated that they wished the latter to stand in the relation to them of son and daughter.

As early as May 27, 1883, Hay and wife received a letter written by Mrs. Piper for herself and husband, which was addressed "Dear Son Edwin and Daughter Florence." It closed with these words: "Do be careful Daughter Florence. As ever most affectionately, Father and Mother Piper." These relations continued during 1883, 1884 and 1885. And on the

23d day of December, 1885, Doctor Piper wrote to Hay, addressing him as "My Dear Boy." After referring to Hay's then recent sickness, he said: "I wish that we were in Washington to look after you a little—perhaps we could help you some in that direction. By the way, what do you think of our looking to your city as a residence for the few years still perhaps left to us? Suppose I could command, say twenty-five thousand dollars certainly, and perhaps nearly as much more, what would you think it?. We have no relations or friends to whom we owe anything as to the final disposition of our property." That letter thus closed: "Good night, with much love to you all son, daughter, grandchildren and all."

Under date of January 11, 1886, Piper again wrote Hay, addressing him as "Dear Son, Ned." And on the 14th of January, 1886 another letter, signed "Father and Mother Piper," and addressed to "Darling Edwin and Florence," was written as Piper and wife were about to leave Chicago for San Francisco, in which city the Doctor was to appear as an expert witness in the matter of handwriting. In that letter, which was written by Mrs. Piper for herself and husband, Hay and wife were informed that a will had been prepared and left in the custody of Judge Charles H. Wood of Chicago, by which "we bequeath to you the whole of our property with the exception of a few legacies amounting to about five hundred dollars." In the same letter it was said: "In case of Dr.'s death Edwin and I are appointed executors of the Dr.'s will. In case of our death by accident on the journey, Edwin will attend to all business connected with all property left by us, which with the exception of the legacies goes to Edwin as above stated. He will of course find the will deposited as above said with Judge Wood, and with it a schedule of property, and also a key to box in safe deposit vault of First National Bank, containing property as set forth in schedule above noticed. Edwin will look after this matter as soon after our death as possible, as there are some things in the papers and the will which will need immediate attention." The following postscript was added: "In case we are killed on our journey, going or returning, Edwin will

find in connection with the will what we would desire to have done with our remains."

Under date of June 6, 1886, they wrote to " Dear Son Edwin and Daughter Florence " about the case upon which the Doctor had been engaged as an expert in handwriting, saying : " He has been very busy with a case which I wrote you about in my last, for this, which required an immense amount of work, he received $5000 ; of course this is not to be mentioned to anybody but *our children.* The case was won." That letter closed with these words : " Good night from us both dear children. May heaven's choicest blessing be showered upon you. As ever affectionately, Mother and Father Piper."

Two days later, June 8, 1886, they wrote another letter addressed to " Dear Son Edwin and Daughter Florence," in which they said : " And now dear children I need not tell you how much we want to see you and the darling children. . . . When we meet, which we shall do some time if nothing providential prevents, when I trust all can be arranged to the satisfaction of you our dear children and ourselves. . . . Mr. Hyde, to whom we introduced you, is an excellent man, knows nothing of the relation we bear to each other particularly ; only of course we tell him as we do everybody that you and yours are very dear to us, and that we look upon you as our children ; we did not enter into further particulars." That letter closed with these words : " We *both* send you oceans of love dear ones, let us hear soon, and believe us to be now and ever, on this side and the *other* if permitted, your affectionate, father and mother, R. U. and E. F. Piper."

Other letters of like character were written during August and September, 1886. Under date of October 5, 1886, Piper and wife wrote to Hay, saying : " We rejoice to hear that you are all well, and thank you again dear, dear children for your loving words, which we well know come from your loving hearts ; we fully appreciate them all, I cannot tell you in words how much. . . . We shall be most happy to come to Washington, when it is convenient all round, more of that dear Edwin and Florence, if we reach Chicago in safety. Write us when you can, it is always a joyful event to us to receive your dear letters.

We long to see you all, and if we live shall come when you are ready; in the meantime may heaven shower upon you and yours its choicest blessings.    Dr. always reiterates *all I say*.    I write *all* letters for him as that helps a little.    As ever most affectionately, Father and Mother Piper."    " We know you and Florence are truly happy in each other, dear Edwin, and that is one reason why we love you both so much.    As ever affectionately, Mother and Father Piper."

Hay received another letter under date of November 7, 1886, addressed to him as " Dear Son Edwin,' in which it was said : " The Dr. sends you the duplicate of a draft.    The Dr. says : My legal friends here tell me that it would be evidence of property in the hands of an administrator in case of my death, and of course you would know how to collect it."    Upon the back of that letter was the following endorsement : " The draft is for $5300, fifty-three hundred dollars.    We have also with us four trunks, containing clothes, and valise, microscope in box, and two valises."

Under date of November 19, 1886, Hay and wife received another letter addressed " Dear Daughter and Son," in which these passages occurred :  " Dr. is anticipating great enjoyment from rides with Edwin, Jr.    Now from Dr.    He wishes me to say : We have now, in safety deposit vaults, twenty thousand dollars in cash, besides as you know the house built two years since which is worth ten thousand dollars.    Dr. is anxious about investment and wishes you were here to consult him about it. Would you think it best to invest more here?    Please write on receipt of this what you think of the matter, or is best to wait until we come to W. and then invest?    Please answer at once. As ever dear children, Father and Mother Piper."

Shortly after that letter was written a girl was born to Hay and wife, and was named for Mrs. Piper.    Under date of December 15, 1886, Mrs. Piper, addressing Hay and wife as " Dear, Dear Children," on behalf of " Father and Mother Piper," wrote : " We are both much pleased with your kind thoughtfulness in naming the dear little one for us both, the Piper for Dr. and the Elizabeth for me.    .    .    Would you both not rather call her Elizabeth Frances Piper Hay, you could then call the darling

Frances, rather than by the perhaps old-fashioned name of Elizabeth." This request of Mrs. Piper was complied with, and the baby was named Elizabeth Frances Piper Hay. Later, January 17, 1887, Mrs. Piper wrote: "Dr. has for several weeks called me grandma, and I am very proud of the title; I forget sometimes to call him grandpa, but shall soon become accustomed to doing so."

According to the evidence of Hay several letters followed in relation to Doctor and Mrs. Piper coming to Washington. The result was that Hay and his wife consented to their coming to Washington. Under date of March 11, 1887, Mrs. Piper wrote to Hay: "I feel, however, that the Dr. must go somewhere before that time, and if it is not perfectly convenient for us to come to Washington at present, we will wait and take a short trip to Colorado or somewhere else. Now my dear son and daughter, tell us the exact truth with regard to this matter, as there *should surely be no hesitation in stating facts between us.* Our best love to darling Florence, and the babies, and a large share from us both for yourself. As ever affectionately, Father and Mother Piper."

This was followed by another letter, dated March 18, 1887, in which it was said: "I feel very anxious about him, I am still; and as physicians and friends all insisted that a change was better for him than anything else, and he is so much attached to you all, that I ventured to press the matter to our children, so I am sure you will appreciate. If we live and Dr. is able, I think we will start for W. some time next week, to-day being Friday the 18th. I would not come now as you are situated did I not feel so anxious about the Dr., and I cannot get him started for any other place now, although he did think he would go to Colorado, but he dreads going among strangers. As ever affectionately, Father and Mother Piper."

Doctor and Mrs. Piper arrived at Washington on the 25th of March, 1887, stopping at Hay's residence. Being asked under what conditions or arrangements they came to his home, Hay testified: "Pursuant to the conversations we had had and the communications that had passed between us prior to their arrival, they came to live with us as a mother and father would

come to live with children, and their dwelling with us was conditioned upon a covenant and agreement entered into that in consideration of permitting them to reside with us in this relationship during the balance of their lives and the services and care to be given to them that he would build a house in the city of Washington, District of Columbia, in which we should live together, and that at his death, not only the house, but all of his property should be willed to me." Hay further testified: "And Dr. Piper further stated that should I be taken away he would provide for Mrs. Hay and the children as if they were his grandchildren and she his daughter, and that should both of us be taken away during his lifetime he would likewise provide for the children, and that he would rear and raise them, and upon this Mrs. Piper and Doctor Piper, Mrs. Hay and myself shook hands, and the Doctor himself called upon Heaven to witness the sincerity of the agreement." Being asked whether it was part of any agreement with Doctor and Mrs. Piper that they were to pay board at his house, Hay testified: "No; such a thing as board was absolutely never considered for a moment, nor, in fact, did the Doctor ever, for himself or his wife, pay one cent of money to me or Mrs. Hay for anything, but especially for board. Such was not the condition nor the agreement nor the understanding, as we were not breaking up our family and our family relations to take boarders, as there was no necessity to do such a thing. . . . The Doctor paid nothing whatever toward the running expenses of my house in any way whatever or for anything, except, it occurs to me, at one time while we were away during a few weeks in the summer he asked if the hired manservant might return to wait upon him; and, if so, he would pay to him the sum of $10 per month. I don't know how much the Doctor paid, but it was not more than two months' wages."

Believing that the arrangement with Dr. Piper and his wife was to last during their lives, and desiring to make home as pleasant and agreeable as possible, Hay incurred considerable expense in furnishing proper apartments for them. The painting and papering were renewed. Rooms were set apart for their exclusive use, toward the furnishing of which the Doctor

paid nothing. In expectation of their coming to his house as their permanent home, Hay had a bay window constructed on the front of his house, and erected a back building, so as to give an additional and larger dining room, a sleeping room, and a hall and bath room. The situation of Piper and wife in their new home was thus described by Hay in his deposition : " Doctor and Mrs. Piper were taken into our family just the same as if they had been our own father and mother; if anything, they were treated better than blood relations could possibly have been treated, as it was the constant desire of both Mrs. Hay and myself to make life as pleasant for them as it possibly could be under any circumstances, and so we put ourselves out in order to do so, notwithstanding that in prior communications they insisted that there should be no change in the relationship in our family and their family affairs."

Being asked what change, if any, was caused by the presence of Piper and wife in his home, Hay said : " The daily care of their rooms, the additional preparation and provision of food, and the especial manner of cooking it necessary to satisfy the Doctor, he being exacting in this particular. . . . There were certain meats that the Doctor did not eat, steak being the favorite meat for himself, and it having always to be provided for him; the cooking of a number of other dishes, different from what we had been accustomed, entailing additional and extra labor upon the cook." He further testified : " Everything was done for the pleasure of Doctor and Mrs. Piper. We were at home in the evenings, and brought in friends whom we thought would be congenial to the Doctor in his peculiar tastes. Doctor Piper, being a universally well read man, was ready to converse upon almost every subject. . . . Originally he graduated as a doctor of medicine and surgery, and in his early days was the author of a wonderful book in its time, entitled ' Piper's Surgery.' Being an artist, he was the first among the etchers in our country, and this book contains upwards of eighteen hundred illustrations, produced entirely with his pen. This book was used during the war in the army. Since that time he has illustrated a book upon ' Trees,' and has done very much fine microscopic work, and so he became interested in

everything that could come under it, and finally got into hand-writing, the use of the camera lucida being his method of exam-ination.   Since that time he had lost all other occupations, ex-cept that of being an expert in handwriting, and also a micro-scopic for the examination of food and of blood, and has been engaged in many cases that are recorded in the books.   .   .   .
As the letters indicated, the Doctor did not seem to be well, but he has always been complaining.   .   .   .   He required constant and particular attention, so much so that a physician was called in regularly and constantly for the purpose of fre-quently looking the Doctor over, and he continued his atten-tions to Dr. Piper during the years he was with us.   .   .   .
They were perfectly contented and happy, and when a few weeks afterwards, to wit, in August, 1887, we were away at the seashore, many, many affectionate letters were written by them.   The following is from one dated August 8, 1887, speak-ing of the Doctor : ' He says, tell the dear children with much love that he rejoices in their happiness, and I assure you that he will do everything possible to promote it, and be assured I will second all his efforts.' "   This last letter was addressed to " Dear Daughter Florence and Son Edwin " and was signed, " As ever affectionately, Father and Mother Piper."

The circumstances under which the lots in question were purchased and a house erected thereon may be thus summarized : Shortly after Dr. Piper reached Washington he insisted upon the purchase of a lot and the building of a house upon it to be occupied by the Hay family, in connection with himself and wife.   His avowed purpose was to have a house in which all could live, and in which everything would be according to their liking.   After looking at many lots, the one on Corcoran street was purchased, and attention was at once given to the prepara-tion of plans for a residence.   Hay drew the plans and sub-mitted them to Dr. Piper before engaging the service of an architect.   They were not revised by the Doctor, he saying that " whatever Mrs. Hay wanted was satisfactory to him," and that everything should be done as she desired.   The plans were such as to give a double house, with a hall through the center. The sitting room, parlor, and the dining room, as an " assem-

bly " place for the whole family, were to be on the first floor. On the second floor it was arranged that upon the left of the hall, fronting north, the Doctor should have a sitting room; back of that a sleeping room and a bath room, all of which were for their exclusive use, apart from the rest of the house.

As soon as the lot was purchased and paid for by Doctor Piper's check, and the plans for building were completed, and the ground broken for the house to be built, Piper insisted upon employing an attorney to write a will that would cover this and all other property owned by him. In the presence of Hay and the attorney engaged to write the proposed will, Mr. W. A. Cook, the Doctor referred to a former will made by him and deposited with Mr. Wood in Chicago, and stated " that as he had acquired additional property in the District of Columbia since that time and wishing everything to be exactly right in the matter that he would make another will, so he instructed Mr. Cook, in my presence, to make a will, including this property in the District of Columbia, No. 1512 Corcoran street and the lots upon which it stands, and all of his property wherever situated, especially naming that in Chicago, and devising all the same to me, in trust for his wife, and at her death to belong to myself, my heirs and assigns forever." Subsequently to this interview with the attorney, the Doctor informed Hay that the will had been prepared and witnessed by three persons, and that he had "deposited it in the safe deposit company on the Avenue." Hay did not know what became of that will.

The statements of Hay in reference to the making of that will are sustained by the testimony of Mr. Cook, who stated in his deposition that he had prepared for Dr. Piper a will, which was duly signed, acknowledged and attested by witnesses, and by which the property in dispute on Corcoran street was devised to Hay. Dr. Piper stated to Mr. Cook " that the house [on P street] belonging to Mr. Hay was not a sufficient house, and that he ought to have a better and larger house, and he proposed to buy a lot, to which I have referred [on Corcoran street], and have a house erected on it suitable for Mr. Hay, and for his own accommodation, and one that would exist absolutely in Mr. Hay when completed." Again, the same wit-

ness: "He, Doctor Piper, said he was exceedingly pleased with the disposition that he had made of the house in giving it to Mr. Hay; that he had no regret in doing so; that his comforts and enjoyments had been greater after the giving of the house and after it was occupied by Mr. Hay than his comforts and enjoyments had been previously, and that if he had it to repeat he would make the same will and the same disposition of the property."

The work upon the house was watched with great interest by Doctor Piper and his wife. Quite a number of changes were made during its progress. They were made, Hay testified, "at the request of Mrs. Hay—the Doctor acceded to her wishes as he said he wished to have everything as Mrs. Hay desired it, because the house was being built for us and it should be in accordance with our ideas." The original intention was to have the house heated by furnace. But that was changed to steam heat at an expense of $1000, of which Hay paid $700.

The house having been completed possession was delivered by Doctor and Mrs. Piper to Hay and wife. The latter moved into it on the first day of August, 1888, and have been in possession ever since. Hay furnished the house completely with the exception of Dr. Piper's sitting room which was fitted up by the latter with furniture brought from Chicago. In addition to the furniture taken from the P street house, Hay was compelled to supply other furniture to the amount of about $1200. He also paid for gas fixtures and mantels throughout the house; also for chandeliers. Going from the P street house into the house on Corcoran street necessitated the employment by Hay of two additional servants. Substantially, the entire expense arising from the occupancy of the new house was met by Hay.

*Mr. A. S. Worthington* for appellant. *Mr. B. F. Leighton* was on his brief.

*Mr. Jeremiah M. Wilson* and *Mr. A. A. Hoehling, Jr.,* for appellee. *Mr. E. B. Hay* was on their brief.

Mr. Justice Harlan, after stating the facts as above reported, delivered the opinion of the court.

It appears from this statement that Doctor and Mrs. Piper, each somewhat advanced in years, were without children and had no kin to whom the husband desired to bequeath his estate. They longed for the comforts and happiness of a home in which they would have the sympathy, attention and care of younger people upon whom they could look as their children.

The bill alleged that the property in question was purchased by Doctor Piper in execution of an agreement in parol between him and Hay, whereby Piper and his wife were to become members of Hay's household in Washington and to be supported, maintained and cared for by Hay during their respective lives, in consideration of which Piper was to convey by will or otherwise to Hay all of his property of every kind and wherever situated; that in part execution of that agreement Piper purchased the lots in question and built a house thereon; that in further execution of it Piper put Hay in possession of the lot and house to be occupied as a home by the latter and his family in connection with Piper and his wife; and that while the plaintiff was in actual occupancy of the premises as his home—and he was still in such occupancy when this suit was brought— Piper, in violation of his agreement and for the purpose solely of defrauding the plaintiff, put the title to the property in his niece, the defendant Whitney.

Was there any such agreement between Piper and Hay? If so, was there such part performance of it as entitled the plaintiff to a conveyance from Piper, had he lived until the decree was passed? These are the questions for determination in this case.

In the allegations of his bill and in every essential fact Hay is so thoroughly sustained by witnesses that we do not hesitate to declare that the agreement with Piper is proved to have been just as stated by him. There can be no reasonable doubt as to its subject-matter, or its terms. There was no element of fraud or misrepresentation on the part of Hay. The terms of the agreement between him and Piper were clear and definite; its provisions fair, just and reasonable; the consideration mutual and entirely adequate. What Hay asked was not in any sense inequitable. That which he undertook to do in execu-

tion of the agreement was done by him promptly and in such way as to give no cause for complaint or objection by Piper. And all that he did had reference to and was consistent with the agreement, and can be referred to nothing else. His plans of life were materially altered in order that he might take care of Piper and wife during their respective lives. Piper put Hay in actual possession of the premises in question in execution of his agreement with Hay. But he failed to do that which was vital to Hay, namely, to put the absolute title to the property in him. Under all the circumstances, the failure of Piper to invest Hay with the legal title was such a wrong to the latter as entitled him, under the established principles of equity, to the protection which would be given by a decree specifically declaring that the defendant holds the title in trust for him. We are of opinion that such relief is consistent with the objects intended to be subserved by the Statute of Frauds; for the decree in favor of Hay does not charge Piper upon his parol contract with him, but rests upon the equities arising out of the acts and conduct of the parties subsequent to the making of the original agreement:

Referring to the Statute of Frauds and to the mischiefs intended to be reached by it, Mr. Justice Story says: "It is obvious that courts of equity are bound, as much as courts of law, by the provisions of this statute; and therefore they are not at liberty to disregard them. That they do, however, interfere in some cases within the reach of the statute is equally certain. But they do so, not upon any notion of any right to dispense with it, but for the purpose of administering equities subservient to its true objects, or collateral to it, and independent of it." A case of such interference is when a court of equity enforces the specific performance " of a contract within the statute, where the parol agreement has been partly carried into execution. The distinct ground upon which courts of equity interfere in cases of this sort is, that otherwise one party would be enabled to practice a fraud upon the other; and it could never be the intention of the statute to enable any party to commit such a fraud with impunity. Indeed, fraud in all cases constitutes an answer to the most solemn acts and conveyances, and

the objects of the statute are promoted, instead of being ob-structed, by such a jurisdiction for discovery and relief. And where one party has executed his part of the agreement, in the confidence that the other party would do the same, it is obvious, if the latter should refuse, it would be a fraud upon the former to suffer this refusal to work to his prejudice." 1 Story's Eq. Juris. §§ 754, 759.

This rule finds illustration in cases in this court; in *Neale* v. *Neales*, 9 Wall. 1, 9, where it was said that "the statute of frauds requires a contract concerning real estate to be in writing, but courts of equity, whether wisely or not it is too late now to in-quire, have stepped in and relaxed the rigidity of this rule, and hold that a part performance removes the bar of the statute, on the ground that it is a fraud for the vendor to insist on the absence of a written instrument, when he had permitted the contract to be partly executed ;" in *Brown* v. *Sutton*, 129 U. S. 238–9, which was a suit to enforce the specific performance of an oral engagement to convey certain real estate to the prom-isee, in consideration of her taking care of the promisor during the remainder of his life, as she had done in the past, the court holding that there had been such "part performance in its exe-cution" as to bring the case within the exception made by that doctrine in the requirement of the Statute of Frauds that the sale of the lands must be in writing; and in *Townsend* v. *Van-derwerker*, 160 U. S. 171, 184, where it was said that "the gen-eral principle to be extracted from the authorities is that if the plaintiff, with the knowledge and consent of the promisor, does acts pursuant to and in obvious reliance upon a verbal agree-ment, which so changed the relations of the parties as to ren-der a restoration of their former condition impracticable, it is a virtual fraud upon the part of the promisor to set up the statute in defence, and thus to receive to himself the benefit of the acts done by the plaintiff, while the latter is left to the chance of a suit at law for the reimbursement of his outlays, or to an action upon a *quantum meruit* for the value of his services." "Courts of equity," said Lord Cottenham, "exercise their jurisdiction in decreeing specific performance of verbal agreements, where there has been part performance, for the purpose of preventing

the great injustice which would arise from permitting a party to escape from the engagements he has entered into, upon the ground of the Statute of Frauds, after the other party to the contract has, upon the faith of such engagement, expended his money or otherwise acted in execution of the agreement. Under such circumstances, the court will struggle to prevent such injustice from being effected; and, with that object, it has, at the hearing, when the plaintiff has failed to establish the precise terms of the agreement, endeavored to collect, if it can, what the terms of it really were. It is not necessary, in this case, to adopt any such course of proceeding; for I think an agreement for a lease sufficiently proved, and that acts of part performance are proved, so as to take the case out of the Statute of Frauds; and I think the defences set up have wholly failed." *Mundy* v. *Jolliffe*, 5 My. & Cr. 167, 177.

To the like effect are numerous other American and English cases which are familiar to the profession and need not be cited. They all proceed upon the ground that, although in a suit to enforce the specific performance of a parol agreement in reference to land the defendant cannot be directly charged upon the alleged contract itself, he may be held—the evidence clearly showing part performance, in substantial particulars, of such agreement—to do what justice requires to be done under the equities arising from acts done after the making of the agreement and in execution of its provisions. To refuse under some circumstances to compel the full execution of an agreement of that kind which has been partly performed would make the statute an instrument of fraud, and that a court of equity will not permit. "It is not arbitrary or unreasonable," said the Lord Chancellor in *Maddison* v. *Alderson*, L. R. 8 App. Cas. 467, 476, "to hold that when the statute says that no action is to be brought to charge any person upon a contract concerning land, it has in view the simple case in which he is charged upon the contract only, and not that in which there are equities resulting from *res gestæ* subsequent to and arising out of the contract."

The alleged agreement being one which a court of equity would specifically enforce if it had been in writing, and it hav-

ing been partly performed by Hay in reliance upon performance by Piper, and Hay being ready and willing to do what, under the agreement, remained to be done by him during the lives of Doctor and Mrs. Piper, he was entitled to the decree rendered in his favor; and it is

*Affirmed.*