**CITY STORES COMPANY, Plaintiff,**

v.

**H. Max AMMERMAN et al., Defendants.**

**Civ. A. No. 98–66.**

United States District Court

District of Columbia.

April 5, 1967.

Robert Martin, Alexander B. Hawes and Richard Shlakman, of Fowler, Leva, Hawes & Symington, and Richard K. Lyon, Washington, D. C., for plaintiff.

H. Max Ammerman, pro se, and Edgar H. Brenner and Melvin Spaeth, of Arnold & Porter, Washington, D. C., for defendants.

## OPINION

GASCH, District Judge.

The plaintiff, City Stores Company, seeks specific performance of a contract wherein defendants allegedly promised to offer plaintiff a lease as a major tenant in defendants' shopping center in Tyson's Corner, Fairfax County, Virginia. By the terms of the contract, the defendants were to give plaintiff an opportunity to accept a lease on terms at least equal to those offered to other major department stores in the center. The court granted a preliminary injunction to prevent the defendants from leasing the last available department store site to another department store. Now the court is called upon to decide whether there is a valid contract and, if so, whether it is sufficiently definite so that specific performance of it should be decreed.

Defendants desired to construct a large shopping center on a tract of land near Tyson's Corner, in Fairfax County, Virginia. In order to build the center, they had to persuade the Board of County Supervisors of Fairfax County to rezone the property for that use. By the time plaintiff came into the picture, defendants' prospects for securing the necessary zoning were not good: the Fairfax County Planning Commission and the Planning Commission Staff had voted against defendants' requested zoning. Defendants had to persuade the Board that these advisory groups were wrong in their recommendations. Moreover, defendants had an extremely strong competitor, the Rouse-Reynolds group, for another shopping center in the same general area. There was a zoning application for the Rouse-Reynolds center pending before the Board of Supervisors at the same time. Hearing on defendants' application was set for May 31, 1962.

During a period of time prior to May 31, Lansburgh's Department Store, which is owned by City Stores Company, the plaintiff herein, had been negotiating the terms of a lease of a store site in the Wheaton Plaza shopping center with defendants Lerner and Gudelsky. In the course of meetings with Mr. Lerner, or Messrs. Lerner and Gudelsky together, Lansburgh's president, Mr. Jagels, learned of the Tyson's Corner proposal. Mr. Lerner asked for a letter from Lansburgh's expressing a desire to participate in defendants' Tyson's Corner project, which could be used in the hearing before the Fairfax County Board of County Supervisors. Mr. Lerner had sought similar letters from other department stores in Washington, but found them unwilling to express a preference for defendants' Tyson's Corner site over the nearby proposed site of the Rouse-Reynolds group. Under normal circumstances, Lansburgh's also would have been unwilling to express a preference for one site over the other. It was eager

to obtain suburban department store sites for expansion purposes. But, for a reason which is a matter of dispute between plaintiff and defendants, Mr. Jagels wrote a letter to Mr. Lerner and Mr. Gudelsky (Plaintiff's Exhibit E) in which he stated that it was Lansburgh's conclusion that the Tyson's Corner site was preferable to any other in the area and expressing Lansburgh's great interest in becoming a major tenant at a Lerner-Gudelsky shopping center if they were successful in their zoning application.

Defendants contend that plaintiff wrote this letter in order to secure defendants' help in obtaining necessary permission from other department store tenants in the Wheaton Plaza shopping center for plaintiff to become another major tenant there. However, I find that this contention is not supported by the evidence. The evidence shows that during the period in question, plaintiff and Lerner-Gudelsky had not themselves reached agreement on rental and other terms for plaintiff to become a tenant in the Wheaton Plaza center, and that they were engaged in negotiations. It was not until November of 1962, by defendant Lerner's own correspondence records, which are part of the evidence herein, that either plaintiff or defendants became aware that there would be an objection raised to plaintiff's tenancy by Montgomery Ward, one of the major tenants at Wheaton Plaza with right of approval of other lessees.

Plaintiff contends, on the other hand, that the Jagels letter to Lerner and Gudelsky was written at Lerner's request in exchange for a promise that plaintiff would be given an opportunity to become a major tenant at Tyson's Corner on terms at least equal to those of other major tenants at the center.

■■ I find that on or about May 29, 1962, the Lerner-Gudelsky interests promised to give Lansburgh's an opportunity to become a major tenant at the Tyson's Corner center on terms at least equal to those granted other major department store tenants in exchange for assistance from Lansburgh's in securing the necessary zoning for the tract. I further find that on or about May 29, 1962, the defendants Lerner and Gudelsky signed and gave to Lansburgh's president Jagels the following letter concerning the defendants' promise, and that this letter, together with plaintiff's full performance of the requested services, is a sufficient writing to satisfy the Statute of Frauds, § 12–302 D.C.Code. The letter is Plaintiff's Exhibit B, and states:

Dear Mr. Jagels:

We very much appreciate the efforts which you have expended in endeavoring to assist Mr. Gudelsky and me in our application for zoning at Tyson's Corner for a Regional Shopping Center.

You have our assurance that in the event we are successful with our application, that we will give you the opportunity to become one of our contemplated center's major tenants with rental and terms at least equal to that of any other major department store in the center.

Sincerely yours,

/s/

Isadore M. Gudelsky

/s/

Theodore N. Lerner

■ I also find that the services plaintiff performed for defendants, particularly the letter from Mr. Jagels which defendants used to support their case in the zoning hearing on May 31, constituted adequate consideration for a valid unilateral contract which was binding on defendants thereafter.

I

The plaintiff contends that this unilateral contract is an option for an opportunity to accept or reject a lease for a store at Tyson's Corner on terms at least equal to those granted to other major tenants. Defendants deny that the agreement is an option contract and contend that, even if it were, it would not be

sufficiently definite to be specifically enforced by this court.

 In determining the nature and consequences of this contract, it should be observed first that a typical option contract is a continuing offer for a fixed period of time (or a reasonable time if no time is specified) which is binding on the offeror because given for a valuable consideration.[1] As noted by Williston, the word "option" is a business and not a strictly legal term. 5 Williston on Contracts § 1441 (Rev.Ed.1937). An option contract is a unilateral contract as is the contract at issue. Generally, however, an option contract describes specifically the subject offered and all its material terms. The offeree knows at the time he receives the option exactly what has been offered and what he may accept or reject. It is obvious that the contract between Lerner-Gudelsky and Lansburgh's is not of this description, and further analysis is needed to decide whether or not it may be classified as an option, despite its superficial dissimilarity to the usual form.

In this case, it is clear that an option in typical form could not have been offered by Lerner-Gudelsky, because they had nothing but a contingency to offer at the time the contract was made. Any specific terms they might have included in their letter to Jagels would have been meaningless in view of the fact that they had neither received the necessary permission to construct their center, nor had they entered into leases with other major tenants which were to be the measure of the lease offered to Lansburgh's. Yet it does not follow from this that what they did promise to offer Lansburgh's was without substance. What we have here is a contract with certain conditions precedent to its operation.

The first condition precedent to the Lerner-Gudelsky obligation to Lansburgh's was the securing of necessary zoning for its Tyson's Corner tract, without which it could not construct a shopping center at all. The second condition precedent was its entering into leases with other major tenants for stores in the center, so the terms of those leases could provide the essential terms of a lease to be offered to plaintiff. Defendants did secure the zoning, and they did, in the latter half of 1965, enter into leases with Woodward & Lothrop and Hecht department stores. At the time it secured those leases, defendants were under an immediate contractual obligation to tender plaintiff a lease which in all its material terms would be at least as favorable to plaintiff as the two other leases were to their respective stores. That this would have been possible is entirely clear from the record: both the Hecht and Woodward & Lothrop leases, Plaintiff's Exhibit F, contain clauses to the effect that their terms will be at least equal to those offered to other lessees in the center. Thus, even though none of the stores in the center will be identical in design, it is apparent from defendants' own leases that complete equality of material terms governing occupancy, including amount of space and cost per square foot, and substantially equal terms on less material aspects of the lease, is within the customary contemplation of parties entering into shopping center agreements of the type at issue in this case. When it is recognized that a lessor's success in a shopping center is directly tied to the success of all of his lessees, it must be conceded that as a practical business matter it is to the lessor's advantage that one tenant be given no distinct competitive advantage over another traceable to the terms of the leases entered into.

 I therefore hold as a matter of law that the Lerner-Gudelsky letter was a binding unilateral contract, which gave plaintiff an option to accept a lease at Tyson's Corner, and that the existence of express and implied conditions precedent did not render it invalid or too indefinite to be a contract.

 Defendants argue, in their Post-Trial Reply Memorandum, that the

1. Willard v. Tayloe, 75 U.S. 557, 8 Wall. 557, 19 L.Ed. 501 (1869).

Lerner-Gudelsky letter to Lansburgh's is not a good contract because it is supported only by "past consideration." They rely on the case of Murray v. Lichtman.[2] But the decision in Murray v. Lichtman does not help defendants in this case; on the contrary, it adds emphasis to the distinction—which defendants have failed to make—between the origin and nature of unilateral and bilateral contracts. A unilateral contract is created when the service requested by the offeror is performed by the actor. Upon completion of that performance, the offer becomes a *promise* contractually binding on the offeror-promisor. A unilateral contract has only one promisor, not two. Any attempt on the part of that promisor to later modify his obligation must be supported by new consideration.

The Lerner-Gudelsky letter in the present case is an option, a unilateral contract. Defendants became bound to deliver it to plaintiff the moment plaintiff performed the requested services. There is no contention here that the letter represents an integration of a prior oral bilateral agreement or that it is intended to represent a written bilateral contract. Plaintiff consistently has viewed the letter as an option, and that is what the Court, on the evidence, finds it to be.

 Defendants also contend that this contract should be governed by the rule that where material terms remain to be decided by the parties, there is no contract at all, let alone one that can be specifically enforced. However, as the authorities cited by the defendants clearly reveal, that rule applies only where the parties fail to reach an enforceable agreement, that is, an agreement for a valuable consideration which is binding on both parties. 1 Williston on Contracts § 103 (Jaeger 3d Ed. 1957). It would be grave error to apply this rule to a binding option contract or to any contract where the promised performance (the consideration) has been completed by one of the parties. It is especially important in the context of this case to note that the rule has no applicability to options. An option is a true contract although in the form of an offer. Its form doesn't make it any less a contract, binding on the offeror and subject to the offeree's acceptance or rejection. For purposes of determining its definiteness and validity, an option must not be confused with the future bilateral contract it may give rise to, if the offeree decides to exercise it. An option granted for a valuable consideration, to enter into a bilateral contract later if the optionee chooses, fixes the optionee's rights. The offeror may not then revoke his offer (the option) because the optionee has given consideration for it.

This is to be contrasted with the situation where the parties merely discuss.

2. 119 U.S.App.D.C. 250, 339 F.2d 749 (1964). In Murray v. Lichtman there was evidence to show that defendant promised to indemnify plaintiff for any liabilities he incurred in exchange for plaintiff's help in arranging the sale of a building. Plaintiff performed as requested and, after he had completed his performance, defendant sent him a letter promising to indemnify him, but attaching a substantial condition to that promise. The plaintiff signified his approval of this letter by signing it at the bottom. Plaintiff later was forced to seek indemnification from defendant and defendant refused it on the ground that the need for it was contrary to the condition stated in defendant's letter. Plaintiff brought suit, and argued that the defendant should be held to his promise as stated orally prior to the writing of the letter. The trial court accepted defendant's argument that even if there had been a prior oral agreement, the writing constituted a written integration of that agreement and that the writing must control with respect to any inconsistencies because of the parol evidence rule. The trial court therefore granted defendant's motion for summary judgment. The Court of Appeals reversed and remanded because of the genuine issue of fact as to the existence of a prior contract. It rejected defendant's argument that the letter was a written integration of a prior contract, and pointed out that, assuming the prior contract, defendant's obligations under it had been fixed at the moment plaintiff performed the services requested. The contract could not be modified later by a writing which was unsupported by new consideration, in view of plaintiff's full performance.

entering into a bilateral contract and perhaps go so far as to exchange suggested wording of such a contract, but where the negotiations fall short of actually becoming a binding contract. There is no exchange of consideration, either in the form of performance or of enforceable mutual promises in that type of case. And it is to such cases that the rule suggested by the defendants applies, not to the case at bar.

Although the defendants cited no cases from this jurisdiction, it is worth examining some of those they did cite to illustrate the distinction. In Peoples Drug Stores v. Fenton Realty Corporation, 191 Md. 489, 62 A.2d 273 (Md. 1948), no option was involved at all. The parties had been negotiating a contract, also for a store in a shopping center, and had corresponded concerning the terms of a proposed lease, which was to be drawn up by the plaintiff. *But the letter stated that the lease was to be subject to the defendant's approval.* Thus, if the defendant chose not to approve the lease, there was no contract at all, because a bilateral contract was contemplated, and if one of the parties was not bound, neither would be bound. As the Maryland court remarked:

> "The question whether the parties negotiating a contract intended to be bound by their oral agreement but contemplated a written instrument merely as evidence of their agreement, or whether they did not intend to bind themselves until a contract was prepared and signed by them, must be decided from the facts and circumstances in each particular case." 62 A.2d 273, 275.

After reviewing all the facts in that case, the Maryland court decided that no contract had been intended by the parties until the lease was actually signed. It is noted that even had the parties reached a binding oral agreement in this case, the contract thus formed would have been bilateral and not a unilateral option contract.

In Store Properties, Inc. v. Neal, 72 Cal.App.2d 112, 164 P.2d 38 (1945),

plaintiff and defendant both had signed a letter purporting to describe the material terms of a lease assented to by both parties. However, paragraph (9) of this letter contained the following language:

> "If a lease upon the above terms and conditions has not been executed within thirty (30) days from the date hereof, both parties reserve the right at any time thereafter, but prior to the execution of such a lease, to terminate this offer and the above sum of $5,-000.00 shall thereupon be returned to the lessee upon demand." 164 P.2d 38, 39.

As the California District Court of Appeal observed, this clause, taken together with other language in the letter, indicated that neither party was bound by the letter, but that both parties contemplated being bound only upon the execution of a formal lease, if one should be executed. Again, this case did not involve an option agreement.

Elkhorn-Hazard Coal Co. v. Kentucky River Coal Corp., 20 F.2d 67 (6th Cir. 1927), also relied upon by defendants, involved a letter from defendant to plaintiff which the court found was not intended to be an offer subject to contractual acceptance by plaintiff because the defendant clearly stated that if the suggested terms were approved by the plaintiff, the defendant would cause its general counsel to draw up a lease for the signature of the parties. As the court said, "It was clearly not intended to create contractual relations merely by mailing an acceptance." Again, it is important to note that plaintiff in this case gave the defendant no consideration for the letter to create an option contract; only a bilateral contract was contemplated on terms yet to be agreed upon by the parties.

It is true that the court in Horvath v. McCord Radiator & Mfg. Co., 35 F.2d 640 (6th Cir. 1929), discussed the element of uncertainty in an option contract as a possible bar to a decree of specific performance prior to its disposition of the case on the grounds that no contract existed. (I will discuss the problem of

indefiniteness of terms with respect to specific performance later in this opinion.) However, the discussion was not necessary to the court's decision, as it pointed out in these words:

"These difficulties, more or less insuperable, in enforcing specific performance, we have pointed out; but we do not rest our conclusion upon their existence. To us they are persuasive—if there were otherwise doubt —that the parties did not suppose they had arrived upon any final contract on this subject-matter. They were expressing what is commonly called an agreement in principle, fully recognizing that there must be further agreement upon details before there was a complete legal obligation. * * *" 35 F.2d 640, 642.

Once again, the facts of the case indicate that on the disputed subject matter the parties expressly contemplated entering into a bilateral contract at a future time.

The cases cited by defendants should be contrasted with the early case of Walsh v. Rundlette, 9 D.C. 114, 2 MacArthur 114 (Sup.Ct.D.C.1875), where the Court granted specific performance of an oral bilateral contract to enter into a lease. The defendant in that case argued that specific performance should not be granted because the contract was oral and because its terms were indefinite. However, the Court found, on disputed facts, that an oral contract had been entered into. Once it found a contract on the facts, it concluded that the absence of specific terms from the oral agreement would not bar specific performance, which could be decreed "with such covenants as are usual and incident to leases of the same kind, and such as flow from the contract and are necessary to give it effect." 9 D.C. 114, 119.

A helpful discussion of the distinction between options and bilateral contracts is contained in I Williston §§ 61A–61D, (Jaeger 3d Ed. 1957).

## II

Whether the option contract secured by plaintiff in this case is sufficiently definite to be the subject of a decree for specific performance is quite another question, which does not concern the validity or existence of the contract but only the nature of the remedy available to plaintiff.

It is not contested by the plaintiff that if it were to accept a lease tendered by defendants in accordance with the contract, there would be numerous complex details left to be worked out. The crucial elements of rate of rental and the amount of space can readily be determined from the Hecht and Woodward & Lothrop leases. But some details of design, construction and price of the building to be occupied by plaintiff at Tyson's Corner would have to be agreed to by the parties, subject to further negotiation and tempered only by the promise of equal terms with other tenants. The question is whether a court of equity will grant specific performance of a contract which has left such substantial terms open for future negotiation.

The defendants have cited a number of cases in support of their argument that a court of equity will not grant specific performance of a contract in which some terms are left for further negotiations by the parties, or which would require a great deal of supervision by the court. I have examined those cases cited which were decided in this jurisdiction, because unless the precedents here establish a clear policy one way or the other, this court may exercise its discretion in fashioning an equitable decree. Moreover, this is an area of law in which not all jurisdictions are in agreement, and whichever way this court were to decide the case, there would be cases holding to the contrary in other parts of the country.

Cleborne v. Totten, 61 App.D.C. 69, 57 F.2d 435 (1932), cited by defendants, is not in point. In that case the defendant, lessee under an existing lease, wrote to the plaintiff 11 months prior to the expiration date of the lease to inquire into the possibility of getting a new 3-year lease and also some needed repairs to the leased premises. The letter plainly

was not an agreement to enter into a new lease, and the court so held in denying specific performance.

Hearst Radio, Inc. v. Good, 67 App.D. C. 250, 91 F.2d 555 (1937), likewise is not in point, for there too, the court found that the parties, particularly the widow Mrs. Leese, had not entered into any contract which could be the basis for an action of specific performance.

In Crowell v. Gould, 68 App.D.C. 297, 96 F.2d 569 (1938), the court denied specific performance of a contract which consisted of five separate writings, which contained internal inconsistencies on the point sought to be specifically enforced, indicating that the parties had not agreed as to the terms of the contract. This also is not in point.

In Tucker v. Warfield, 73 App.D.C. 278, 119 F.2d 12 (1941), vague provisions in two separate writings illustrate the general difficulty of granting specific performance of a contract for personal services, of a type not at issue in the present case. Cf. Whitney v. Hay, 181 U.S. 77, 21 S.Ct. 537, 45 L.Ed. 758 (1901), aff'g 15 U.S.App.D.C. 164 (1899).

Melaro v. Mezzanotte, 122 U.S.App.D. C. 244, 352 F.2d 720 (1965), held that a Maryland court action denying specific performance of a contract for alleged indefiniteness was not a bar to an action for damages for breach of contract in the District of Columbia. The holding was based on uncertainty in Maryland law whether an action for damages could have been joined with the action for specific performance in Maryland; on the basis of that uncertainty, our Court of Appeals held that the Maryland judgment was not *res judicata*. The case does not provide any guidance for a determination in this case that the contract at issue here is or is not specifically enforceable, and cites no applicable District of Columbia cases.

Thus, defendants have cited no cases in this jurisdiction that would support the contention that an option contract involving further negotiations on details

and construction of a building may not be specifically enforced.

On the other hand, the 1926 case of Morris v. Ballard, 56 App.D.C. 383, 16 F.2d 175, 49 A.L.R. 1461, held that an option to purchase property which contained a provision as to price "on terms to be agreed upon" was specifically enforceable by a court of equity. The court in that case held that "it became the duty of defendant, upon proper demand, either to accept the agreed purchase price in cash or to specify such terms as were acceptable to him. He had no right to refuse arbitrarily and unconditionally to accept payment solely for the purpose of defeating the option. Such a refusal would operate as a fraud upon the plaintiff." The court further held that the clause "on terms to be agreed upon"

*"was in good conscience a stipulation that he would in fact agree with plaintiff upon reasonable terms of payment, and would not arbitrarily refuse to proceed with the sale. * * ** [Emphasis added.]

56 App.D.C. 383, 384, 16 F.2d 175, 176. The court also quoted Pomeroy, Specific Performance § 145 to the following effect:

"when a contract has been partly performed by the plaintiff, and the defendant has received and enjoys the benefits thereof, and the plaintiff would be virtually remediless unless the contract were enforced, the court, from the plainest considerations of equity and common justice, does not regard with favor any objections raised by the defendant merely on the ground of the incompleteness or uncertainty of the agreement."

56 App.D.C. 383, 384, 16 F.2d 175, 176. I therefore hold as a matter of law that the mere fact that a contract, definite in material respects, contains some terms which are subject to further negotiation between plaintiff and defendant will not bar a decree for specific performance, if in the court's discretion specific performance should be granted. Walsh v. Rund-

lette, supra, adds further support to this position. See also 5 Williston on Contracts § 1424 (Rev.Ed.1937).

The question whether a contract which also calls for construction of a building can or should be specifically enforced apparently never has been decided before in this jurisdiction.[3] The parties have cited no cases on this point.

At the outset, it should be noted that where specific performance of such contracts has been granted the essential criterion has not been the nature or subject of the contract, but rather the inadequacy or impracticability of legal remedies. See 5 Williston on Contracts § 1423 (Rev. Ed. 1937); 4 Pomeroy's Equity Jurisprudence §§ 1401–1403 (5th Ed. 1941). Contracts involving interests in land or unique chattels generally are specifically enforced because of the clear inadequacy of damages at law for breach of contract. As Pomeroy says:

"The foundation and measure of the jurisdiction is the desire to do justice, which the legal remedy would fail to give. * * *

"* * * The jurisdiction depending upon this broad principle is exercised in two classes of cases: 1. Where the subject-matter of the contract is of such a special nature, or of such a peculiar value, that the damages, when ascertained according to legal rules, would not be a just and reasonable substitute for or representative of that subject-matter in the hands of the party who is entitled to its benefit; or in other words, where the damages are *inadequate;* 2. Where, from some special and practical features or incidents of the contract inhering either in its subject matter, in its terms, or in the relations of the parties, it is impossible to arrive at a legal measure of damages at all, or at least with any sufficient degree of certainty, so that *no* real compensation can be obtained by means of an action at law; or in other words, where damages are *impracticable.*"

It is apparent from the nature of the contract involved in this case that even were it possible to arrive at a precise measure of damages for breach of a contract to lease a store in a shopping center for a long period of years—which it is not—money damages would in no way compensate the plaintiff for loss of the right to participate in the shopping center enterprise and for the almost incalculable future advantages that might accrue to it as a result of extending its operations into the suburbs. Therefore, I hold that the appropriate remedy in this case is specific performance.

Some jurisdictions in the United States have opposed granting specific performance of contracts for construction of buildings and other contracts requiring extensive supervision of the court, but the better view, and the one which increasingly is being followed in this country, is that such contracts should be specifically enforced unless the difficulties of supervision outweigh the importance of specific performance to the plaintiff. 5 Williston on Contracts §

3. Virginia has allowed specific performance of building contracts. See Grubb v. Starkey, 90 Va. 831, 20 S.E. 784 (1894), where the Supreme Court of Appeals of Virginia said:

"[A] court of equity has jurisdiction to enforce specific performance of a contract by a defendant to do defined work upon his own property, in the performance of which the plaintiff has a material interest, and which is not capable of adequate compensation in damages; as, for example, an agree-ment on the part of a railway company to make an archway under its tracks, or to construct a siding at a particular point for the convenience of an adjoining landowner. 1 Story, Eq.Jur. § 721a; Storer v. Railway Co., 2 Younge & C. Ch. 48; Greene v. Railway Co., L.R. 13 Eq. 44." 20 S.E. 784, 785 (1894).

See also Chesapeake & Ohio R. Co. v. Williams Slate Co., 143 Va. 722, 129 S.E. 499 (1925).

1423 (Rev.Ed.1937).[4] This is particularly true where the construction is to be done on land controlled by the defendant, because in that circumstance the plaintiff cannot employ another contractor to do the construction for him at defendant's expense. In the case at bar, the fact that more than mere construction of a building is involved reinforces the need for specific enforcement of the defendants' duty to perform their entire contractual obligation to the plaintiff.

Cases from an early date have granted specific performance of construction contracts.[5] In Jones v. Parker, 163 Mass. 564, 40 N.E. 1044 (1895), Justice Holmes commented:

"There is no universal rule that courts of equity never will enforce a contract which requires some building to be done. They have enforced such contracts from the earliest days to the present time." 163 Mass. 564, 40 N.E. 1044, 1045.

Joy v. City of St. Louis, 138 U.S. 1, 11 S.Ct. 243, 34 L.Ed. 843 (1890), is the leading Supreme Court case on specific performance of contracts where the relations between the parties were of a complex nature and might require continuous supervision by the court granting the decree. The Court said on this point:

"In the present case, it is urged that the court will be called upon to determine from time to time what are reasonable regulations to be made by the Wabash Company for the running of trains upon its tracks by the Colorado

---

4. Union Pacific Railway Co. v. Chicago, Rock Island & Pacific Railway Co., 163 U.S. 564, 16 S.Ct. 1173, 41 L.Ed. 265 (1896); Joy v. City of St. Louis, 138 U.S. 1, 11 S.Ct. 243, 34 L.Ed. 843 (1890); Wheeling Traction Co. v. Board of Com'rs of Belmont County, Ohio, 248 F. 205 (6th Cir. 1918); Great Lakes & St. Lawrence Transp. Co. v. Scranton Coal Co., 239 F. 603 (7th Cir. 1917); Gas Securities Co. v. Antero & Lost Park Reservoir Co., 259 F. 423 (8th Cir.), cert. denied 250 U.S. 667, 40 S.Ct. 13, 63 L.Ed. 1198 (1919); Texas Co. v. Central Fuel Oil Co., 194 F. 1 (8th Cir. 1912); Kearns-Gorusch Bottle Co. v. Hartford-Fairmont Co., 1 F.2d 319 (S.D.N.Y.1921); Board of Com'rs of Mattamuskeet Drainage Dist. v. A. V. Wills & Sons, 236 F. 362 (E.D.N.C. 1916); Edison Realty Co. v. Bauernschub, 191 Md. 451, 62 A.2d 354 (1948); Laurel Realty Co. v. Himelfarb, 191 Md. 462, 62 A.2d 263 (1948); Brummel v. Clifton Realty Co., 146 Md. 56, 125 A. 905 (1924); Jones v. Parker, 163 Mass. 564, 40 N.E. 1044 (1895); Zygmunt v. Avenue Realty Co., Inc., 108 N.J.Eq. 462, 155 A. 544 (1931); Grayson-Robinson Stores, Inc., v. Iris Construction Corp., 8 N.Y.2d 133, 202 N.Y.S.2d 303, 168 N.E.2d 377 (1960); Strauss v. Estates of Long Beach, 187 App.Div. 876, 176 N.Y.S. 447 (1919); Prospect Park & C. I. R. Co. v. Coney Island B. R. Co., 144 N.Y. 152, 39 N.E. 17, 26 L.R.A. 610 (1894); McDonough v. Southern Oregon Mining Co., Ltd., 177 Or. 136, 159 P.2d 829, 161 P.2d 786, 164 A.L.R. 788 (1945); Rector of St. David's v. Wood, 24 Or. 396, 34 P. 18 (1893); Edison Illuminating Co. v. Eastern Pennsylvania Power Co., 253 Pa. 457, 98 A. 652 (1916); Municipal Gas Co. v. Lone Star Gas Co. (Tex.Civ.App.), 259 S.W. 684 (1924), aff'd 117 Tex. 331, 3 S.W.2d 790, 58 A.L.R. 797 (1928); Chesapeake & Ohio R. Co. v. Williams Slate Co., 143 Va. 722, 129 S.E. 499 (1925); Grubb v. Starkey, 90 Va. 831, 20 S.E. 784 (1894). In accord, Restatement of Contracts § 371, Comment a (1932).

5. In Grayson-Robinson Stores, Inc. v. Iris Construction Corp., 8 N.Y.2d 133, 202 N.Y.S.2d 303, 168 N.E.2d 377 (1960), the Court granted specific performance of an arbitration award to construct a store in a shopping center. This contract was in the form of a written agreement between Grayson and Iris whereby Iris undertook to build on its shopping center tract a building to be rented to Grayson for use as a retail department store for a term of 25 years. The contract contained a clause providing for arbitration of disputes and, when Iris refused to construct the building, Grayson submitted the matter to arbitration. The arbitrators ordered Iris to proceed with construction. Iris refused to obey the award and Grayson took the matter to court. Iris argued that specific enforcement of the award would be contrary to public policy because it would amount to the granting of specific performance of a building contract requiring long-continued supervision of the court. In affirming the decree awarding specific performance, the Court said: "Clearly there is no binding rule that deprives equity of jurisdiction to order specific performance of a building contract. At most there is discretion in the court to refuse such a decree."

Company. But this is no more than a court of equity is called upon to do whenever it takes charge of the running of a railroad by means of a receiver. Irrespectively of this, the decree is complete in itself, and disposes of the controversy; and it is not unusual for a court of equity to take supplemental proceedings to carry out its decree, and make it effective under altered circumstances." 138 U.S. 1, 47, 11 S.Ct. 243, 257.

The Supreme Court in Joy v. St. Louis distinguished the earlier case of Texas & Pacific Railway Co. v. Marshall, 136 U.S. 393, 10 S.Ct. 846, 34 L.Ed. 385, which is relied upon by defendants herein, because, the Court said, it had held in *Texas* that

"it was much more consonant to justice that the injury suffered by the city should be compensated by a single judgment in an action at law; that there was no substantial difficulty in ascertaining such compensation; and that, therefore, the city had a complete remedy at law. But in the present case, the remedy in damages by an action at law would be entirely inadequate, and nothing short of the interposition of a court of equity would provide for the exigencies of the situation. See, also, Wilson v. [Northhampton &c.] Railroad Co., L.R. 9 Ch. 279." 138 U.S. 1, 49, 11 S.Ct. 243, 258 (1890).

See also Union Pacific Railway Co. v. Chicago, Rock Island & Pacific Railway Co., 163 U.S. 564, 16 S.Ct. 1173, 41 L.Ed. 265 (1896), where the Supreme Court commented in a case involving a similarly complex situation:

"It must not be forgotten that, in the increasing complexities of modern business relations, equitable remedies have necessarily and steadily been expanded, and no inflexible rule has been permitted to circumscribe them. * * *"

The defendants contend that the granting of specific performance in this case will confront the court with insuperable difficulties of supervision, but after reviewing the evidence, I am satisfied that the standards to be observed in construction of the plaintiff's store are set out in the Hecht and Woodward & Lothrop leases with sufficient particularity (Plaintiff's Ex. F) as to make design and approval of plaintiff's store a fairly simple matter, if the parties deal with each other in good faith and expeditiously, as I shall hereafter order.

For example, Article VIII, Sec. 8.1, Paragraph (G) of the Hecht lease (the Woodward & Lothrop lease contains a similar provision) says:

"The quality of (i) the construction, (ii) the construction components, (iii) the decorative elements (including landscaping irrigation systems for the landscaping) and (iv) the furnishings; and the general architectural character and general design, the materials selection, the decor and the treatment values, approach and standards of the Enclosed Mall shall be comparable, at minimum, to the qualities, values, approaches and standards as of the date hereof of the enclosed mall at Topanga Plaza Shopping Center, Los Angeles, California. * * * "

The existing leases contain further detailed specifications which will be identical to those in the lease granted to plaintiff. The site for plaintiff's store has already been settled by the design of the center. Although the exact design of plaintiff's store will not be identical to the design of any other store, it must be remembered that all of the stores are to be part of the same center and subject to its overall design requirements. If the parties are not in good faith able to reach an agreement on certain details, the court will appoint a special master to help settle their differences, unless they prefer voluntarily to submit their disagreements to arbitration.

III

The defendants contend that specific performance of this contract will result in hardship to them, and invoke the maxim that equity will not grant specific performance if the hardship to the defendants is greater than the potential

benefit to the plaintiff. Defendants point to the fact that they agreed with Woodward & Lothrop and Hecht in their leases to limit the number of major department stores in the center to three. That means that if a lease is granted to Lansburgh's, defendants will be unable to negotiate a lease with Sears, which has expressed a willingness to be the center's third department store tenant. The Sears lease would be more valuable to them, defendants claim, because the lease would be for a larger amount of space, and also because Sears would be expected to do a larger business than Lansburgh's, and defendants would receive a percentage share of its profits over a certain minimum amount as part of the agreed rental.

The defendants have not contended that performance of their obligation to Lansburgh's would be impossible or would ruin them financially. In effect, their contention is only that they can make more money by dealing with Sears than with Lansburgh's. This is not a reason for denying specific performance. Willard v. Tayloe, 75 U.S. 557, 8 Wall. 557, 19 L.Ed. 501 (1869). 5 Williston on Contracts § 1425 (Rev. Ed. 1937).

Moreover, the defendants need not have executed leases with both Hecht and Woodward & Lothrop to the exclusion of Sears as a possible additional tenant; nor need they have agreed with Hecht and Woodward & Lothrop that there would be no more than three stores in the center. Plaintiff was not responsible for these actions of defendants and should not be made to suffer irreparable loss due to the limitations which defendants have written into their contracts with Hecht and Woodward & Lothrop and which they now assert as a basis for their refusal to honor their obligation to plaintiff.

The defendants do contend that plaintiff was indirectly responsible, however, in failing to "press its claim" in May of 1964 when defendants advised it by letter that they considered themselves under no contractual obligation to plaintiff. First of all, I find from the record that at all material times the plaintiff through its officers did inform the defendants that it intended to hold them to their contract. Secondly, the defendants in effect imply that the plaintiff, by not "pressing its claim," gave up its rights under the contract, or waived them. But it is elementary contract law that a release of a contractual right (as distinguished from waiver of a condition) is not valid unless made for a valuable consideration. Finally, in May of 1964 defendants' obligation to tender a lease to plaintiff had not yet ripened because one of the conditions precedent to that obligation—execution of leases with other major tenants—had not yet been satisfied. Plaintiff could not have brought an action for anticipatory breach because of the impossibility of assessing damages; it certainly could not have brought an action for specific performance because as yet there was no specifically enforceable contract right. Plaintiff did contact defendants again when it learned that the Hecht and Woodward & Lothrop leases had been executed; and it brought this suit in a timely manner to prevent the defendants from entering into a lease with Sears which would have precluded them from performing their contract with plaintiff. I therefore hold that plaintiff neither gave up its contractual rights nor unnecessarily delayed its assertion of them in this court.

In its original and amended complaints, the plaintiff sought an injunction and asked for specific performance of the defendants' obligation to tender it a lease for plaintiff's acceptance or rejection. At that time, plaintiff had not seen the Hecht and Woodward & Lothrop leases and consequently lacked information on which to base an exercise of its option. I doubt that a court of equity could or would grant specific performance of a mere tender of a lease. As Williston says:

> "It is true that if an attempt has been made to revoke the offer contained in an option for which consid-

eration has been given or which is under seal, to deny effect to the revocation and treat the offer as irrevocable is equivalent to a preliminary specific performance, but it is not effected by a decree in equity. A court of law as well as a court of equity assumes the irrevocability of such offers." 5 Williston on Contracts § 1441 (Rev.Ed.1937).

As the author points out, it is the bilateral contract which arises upon the exercise by plaintiff of the option that is specifically enforced.

During the course of this proceeding, the plaintiff has examined the leases executed between defendants and Hecht and Woodward & Lothrop and has indicated its willingness to accept a lease with terms equal to the Hecht lease. I therefore find that the plaintiff has exercised its option, and is entitled to specific performance of a lease on terms equal to those contained in the Hecht lease.[6]

---

6. See Chrysler Motors Corp. v. Tom Livizos Real Estate, Inc., 210 A.2d 299 (Del.Ch. 1965), where a suit for specific performance of an option to purchase real estate was instituted before the option was exercised, but the option was exercised during the course of the proceeding. Chancellor Seitz commented: "I think the action at that time must be viewed as one in effect seeking a judicial declaration that the option was still valid and binding despite defendant's attempt to revoke it." Specific performance was granted.